**Richard Troyce ROBERTSON**

v.

**SUPERIOR PMI, INC.**

**Civ. A. No. 82–0350.**

United States District Court,
W.D. Louisiana,
Alexandria Division.

Jan. 15, 1985.

Daniel E. Broussard, Jr., Broussard, Bolton & Halcomb, Alexandria, La., for plaintiff.

John G. McLure, Alexandria, La., for defendant.

Anna E. Dow, Gravel, Robertson & Brady, Alexandria, La., Louis M. Kiefer, Jr., Richard S. Vale, Metairie, La., Howard B. Gist, III, Gist, Methvin, Hughes & Munsterman, Alexandria, La., for intervenors.

## OPINION

NAUMAN S. SCOTT, District Judge.

This is a products liability action brought by Richard T. Robertson (Robertson) against Superior PMI, Inc. (Superior) for injuries sustained by Robertson during his employment at Hunt Plywood Company, Pollock, Louisiana (Hunt). Robertson alleges that he was injured by a flying saw, manufactured by Superior and installed by Hunt in its layup line where Robertson worked.

We have diversity jurisdiction pursuant to 28 U.S.C. § 1332.

## FINDINGS OF FACT

1. On July 8, 1981, Robertson was working for Hunt on an assembly layup line in its plywood manufacturing plant in Pollock, Louisiana.

2. The plywood assembly layup line was designed and built for Hunt by Hunt.

3. Hank Clark (Clark), manager of the Pollock facility, who had previously seen flying saws operating in other plants, made the decision to incorporate a flying saw into Hunt's layup line. This was done because the flying saw reduced waste and automated the layup line which would give Hunt great economic benefit.

4. Hunt purchased and installed a flying saw, manufactured by Superior PMI, Inc. (Superior), along with other machinery needed for the manufacture of plywood. The flying saw was installed by Hunt.

5. Although Superior manufactured entire layup lines, Hunt never considered buying the entire line from Superior.

6. A control panel was furnished by Superior, along with the flying saw. Hunt did the complete installation of the saw and the control panel. Superior, however, did assist in the wiring and start-up of the flying saw.

7. No advice was given by the Superior serviceman regarding safety. Superior only advised Hunt as to mechanical operations of the flying saw and made a mechanical inspection at the first start-up procedure of the flying saw.

8. The control panel (switches) was located approximately two feet upstream from the flying saw which operated automatically. There was no need for an operator to be near the flying saw. Limit switches assured that the flying saw always clamped and cut at the same location on the conveyor.

9. The chain drive, which propelled the layup line conveyor, was attached to the flying saw so that the movement of the layup line and the operation of the flying saw were synchronized. This allowed the flying saw's upstream and downstream movement to be stopped automatically when the conveyor line was stopped.

10. At the time the saw was purchased, the only application for the flying saw was on a plywood assembly layup line.

11. During the cutting cycle of the flying saw, the flying saw would travel to its furtherest upstream position, clamp and then make its cut as the material traveled downstream on the conveyor. Once at its furtherest downstream position, the clamp, which was also a guard for the saw blade,

would raise up and travel back upstream to the starting position. At the same time, the saw blade automatically lowered underneath the conveyor line and traveled back to the starting position.

12. The conveyor line could be stopped and started at several locations along the layup line. At some of the work stations along the layup line, the workers would have foot pedals which would disengage the chain drive to the conveyor. This would indirectly cause the cutting cycle of the flying saw to halt because of its synchronization with the conveyor line. The saw blade would still continue spinning, but the travel and movement of the saw and clamp would be halted by the disengagement of the chain drive.

13. The control panel, furnished by Superior and installed by Hunt, was located at Robertson's work station. By use of these controls, Robertson could have stopped and started the flying saw or the whole layup line. These were the only controls which could completely shut down the entire layup line and the flying saw.

14. The foot pedals, which were at the core layers' stations, were used by the core layers to stop the layup line so that the veneer sheets and pieces of core could be straightened on the conveyor.

15. Every 3 to 5 minutes the layup line would be stopped by one of the core layers using the foot pedals. Many times a sheet turner such as Robertson, would yell to a core layer to hold the line. The core layer would step on the foot pedals in order to stop the layup line, so that material could be straightened at his or another worker's station. This was the standard operating procedure for the workers on the layup line at Hunt, because not all work stations had these foot pedals. The workers stopped the line by use of the foot pedals rather than the control panel because it was more convenient and kept production at a higher level. Despite the high level of noise at the plant, this procedure had been successfully followed for a significant period of time by the employees at Hunt.

16. Before Robertson's injury, the workers on the layup line, including Robertson, believed that this standard operating procedure was safe. Hunt had no written procedures regarding the straightening of materials on the line.

17. The workers on the layup line, including Robertson, knew that the layup line and the flying saw could be stopped by use of the control panel, but they also knew that stopping the layup line by use of the foot pedals would also stop the cutting cycle of the flying saw.

18. On the day of the accident, Robertson was working as the last sheet turner on the layup line. His work station was closest to the flying saw. Although the flying saw itself required no operator, Robertson's work station was located within a few feet of the flying saw.

19. Hunt designed the layup line compactly so as to save money and space at their plant.

20. On July 8, 1981, as the material traveled down the conveyor line, Robertson saw a broken piece of core material sticking out from between the veneer on the opposite downstream corner of the material. Robertson thought that the material would cause a jam-up if it went into the flying saw in that condition.

21. Robertson yelled to Allen Hebert (Hebert), who was at the closest core layer's station, 8 to 10 feet upstream from Robertson, to stop the conveyor line.

22. The layup line had actually been stopped by someone other than Hebert and for reasons other than to allow Robertson to straighten the material. When the other core layer had accomplished his purpose, he freed his foot pedal. Since Hebert had not depressed his pedal control, the conveyor line began to move.

23. Thinking that Hebert had stopped the conveyor line for him and that all was safe, Robertson stretched across the 4 foot wide sheets of veneer and core lying on the conveyor. Robertson then attempted to straighten the material, on the opposite

side of the conveyor and downstream toward the flying saw, with his right hand.

24. The flying saw was in the up position, about 1 to 1½ feet downstream from Robertson's right hand, when the layup line was restarted by the worker who had previously stopped the line for another reason. Robertson, who was leaning on his right hand, lost his balance so that his right hand was pinned between the layers of material. His hand was then pulled toward the flying saw by the downstream motion of the conveyor line. The flying saw moved upstream. The flying saw clamp, which holds the veneer and core for cutting and serves as a guard and shield for the saw blade, came down and clamped Robertson's hand. The flying saw made its cut exactly at the same place on the conveyor as it always did. Robertson's right hand was crushed by the clamp and his four fingers were severed by the saw blade. The layup line was running on a fast setting and there was little time to react. When the conveyor line started moving, Hebert tried to stop and did stop the conveyor line with his foot pedal, but the flying saw had already crushed and cut Robertson's hand. All that Hebert could do was to keep the conveyor line and the flying saw from moving downstream, since the foot pedals could not raise the clamp or stop the saw blade from spinning.

25. After Hebert stopped the line, other co-workers shut down the layup line and flying saw and then proceeded to free Robertson's hand from underneath the clamp. With some difficulty, co-workers managed to pull the saw clamp off of Robertson's hand. Robertson was conscious until his co-workers got him off the plywood assembly line. After that, Robertson lost and regained consciousness several times.

26. Thereafter, Robertson underwent multiple hospitalizations and surgical procedures. Efforts to save the severed fingers of Robertson's right hand were unsuccessful. As a result of this injury, Robertson, who was 19 years old at the time of injury, has suffered and continues to suffer physical pain and mental depression.

27. Robertson has only a 10th grade education. He was right handed and now that hand is only marginally useful to him.

28. Since the accident Hunt has installed a metal safety screen all the way across the layup line, between the head sheet turner and the flying saw. This added feature makes it difficult for a worker in Robertson's position to reach under the screen and is a visible warning of the danger existing beyond the screen.

## CONCLUSIONS OF LAW

■ A manufacturer of a product which involves a risk of injury to the user is liable to any person, whether the purchaser or a third person who, without fault on his part, sustains an injury caused by a defect in design, composition, or manufacture of the article, if the injury might reasonably have been anticipated. However, the plaintiff claiming injury has the burden of proving that the product was defective, i.e. unreasonable dangerous to normal use, and that the plaintiff's injuries were caused by reason of the defect. *Weber v. Fidelity & Casualty Ins. Co. of New York*, 259 La. 599, 250 So.2d 754, 756 (La.1971). If the product is proven defective, the plaintiff need not prove any negligence on the part of the manufacturer; for the manufacturer is presumed to know the vices in the things he makes, whether or not he has actual knowledge of them. *Weber, supra.*

■ A product is defective, i.e., unreasonably dangerous, when a reasonable seller would not sell the product if he knew of the risk involved or the risks are greater than a reasonable buyer would expect. *Porter v. American Optical*, 641 F.2d 1128, 1138 (5th Cir.1981); *Hagans v. Oliver Machinery Co.*, 576 F.2d 97 (5th Cir.1978); *Daniels v. Albach Co., Inc.*, 365 So.2d 898 (La.App. 4th Cir.1978).

The flying saw's only application is on a plywood layup assembly line, such as the one constructed by Hunt. It is reasonably foreseeable that a designer of a plywood layup line, such as Hunt, would design and construct a compact plywood layup line in .

order to reduce costs and conserve space. We find that on a compact plywood layup line, such as the one at Hunt, that the last sheet turner is placed so close to the flying saw, that the flying saw is unreasonably dangerous to this worker, in absence of adequate guarding of the clamp and blade.

■ We hold that a manufacturer of dangerous machinery has a duty to protect a worker stationed near that machinery, where it is reasonably foreseeable that the worker would be placed near the machinery and where it is reasonably foreseeable that the worker would suffer injury from that machinery's operation. We find that in this particular case, that duty can only be fulfilled by designing the flying saw so that a physical barrier would prevent the worker from reaching too close to the flying saw; from being pulled into the flying saw by the conveyor; or from inadvertently sticking his hand under the path of the clamp on the flying saw.

■ We conclude that this flying saw, manufactured by Superior, was defective, i.e. unreasonably dangerous, because the clamp and saw blade were not adequately guarded by a physical barrier. The cost of such a barrier would be very small and we cannot find that there would be any production problems caused by such a barrier. We do not think that the manufacture, marketing, shipping or utility of this product will be adversely affected by the production of a flying saw with such a barrier.

We find that this defective product was a cause in fact and a substantial factor in bringing about the foreseeable injury to Robertson.

## DEFENSES

■ Superior has failed to prove that Robertson knowingly and voluntarily encountered the very risk which caused him harm. *Guillotte v. Houston General Insurance Company,* 368 So.2d 1026 (La. 1979). Therefore, the defense of "assumption of the risk" is not supported by the facts of this case.

This injury occurred on July 8, 1981, almost one year after the effective date of La.C.C. art. 2323. We recognize that the Supreme Court of Louisiana has not given a clear definitive answer to the issue of whether La.C.C. art. 2323 is applicable as a defense to a products liability action in Louisiana. Although this question has been certified to the Supreme Court of Louisiana in *Bell v. Jet Wheel Blast,* 717 F.2d 181 (5th Cir.1983), we must make our decision without the benefit of their opinion.

While "... precomparative fault jurisprudence on the relevance of contributory negligence in strict liability cases is obviously significant on the question of how a plaintiff's negligence should be treated in strict liability cases decided under the comparative fault legislation", David W. Robertson, *Ruminations on Comparative Fault, Duty Risk Analysis, Affirmative Defenses, and Defense of Doctrines and Negligence and Strict Liability Litigation in Louisiana,* 44 La.L.Rev. 1341, 1352 (1984), we are of the opinion that the prior jurisprudence is not controlling. La.C.C. art. 2323 should not be interpreted as freezing the issue of the applicability of contributory negligence in strict liability cases according to the weight of the precomparative fault cases. *Id.*

"Unlike some comparative fault statutes that expressly apply only to actions based upon negligence, *see, e.g., Kirkland v. General Motors Corp.,* 521 P.2d 1353 (Okla.1974), Louisiana's statute applies 'when contributory negligence is applicable to a claim for damages.' It proportionately reduces recovery when 'a person suffers injury, death or loss as a result partly of his own *negligence* and partly as a result of the *fault* of another person or persons ...' LSA–C.C. art. 2323." *Lewis v. Timco, Inc.,* 716 F.2d 1425, 1432 (5th Cir.1983). [emphasis ours].

■ The language of LSA–C.C. art. 2323 "... injury, death or loss as the result partly of his own negligence and partly as a result of the fault of another person or

persons" is interpreted by us to require a balancing of negligence (contributory negligence) of the plaintiff and the fault (including strict liability) of the defendant. Accordingly, we hold that La.C.C. art. 2323 is applicable to a products liability cause of action in Louisiana. To hold otherwise would complicate multiple defendant cases and unjustly treat negligent defendants more favorably than strict liability defendants. *Robertson, supra,* at 1354. In order to reach a fair and equitable outcome in any case, the fault of all parties must be considered and quantified. "... [G]eneral considerations of fairness and efficiency support a comparative fault defense in products liability actions." *Lewis v. Timco, Inc.,* 716 F.2d 1425, 1433 (5th Cir.1983).

█ Robertson owed himself a duty of reasonable care in the performance of his work. We find that he failed to use reasonable care in that he failed to use the control panel to shut down the flying saw and the plywood layup line when attempting to straighten the material on the line. In addition, Robertson failed to use reasonable care in that he failed to observe and be aware of the placement of his right hand in relation to where the flying saw would make its cut. We find that the breach of the duty which Robertson owed himself was a cause in fact and a substantial factor in bringing about the harm that he suffered. Accordingly, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to Robertson. We find that percentage to be thirty-five (35%) percent.

## ATTORNEY'S FEES

█ We find that La.C.C. art. 2545 and the ruling in *Philippe v. Browning Arms Co.,* 395 So.2d 310, 318–319 (La.1981), regarding the award of attorney's fees in products liability cases, only grants that remedy in favor of a purchaser of the product. Since Robertson was not the purchaser of the flying saw, attorney's fees cannot be awarded in the case at bar.

## DAMAGES

█ Robertson usually worked 46 hours a week at Hunt, earning $5.35 per hour for straight time and $8.03 per hour for overtime. Robertson also received fringe benefits consisting of major medical, hospitalization and life insurance.

The unrebutted evidence produced by the plaintiff shows an estimated total loss of earnings, from the date of injury to the date of trial, to be $51,255.86. We find that figure to be accurate.

Robertson was 19 years of age at the time of his injury and had only a 10th grade education. The unrebutted testimony of the plaintiff's economist, Dr. Jan Duggar, was that Robertson had a work-life expectancy of 37.76 years, at the time of the accident. Robertson has a permanent partial loss of function of his right hand estimated at 65%.

Although it may be a year before Robertson is able to return to work, we do not find Robertson to be totally disabled. It is our opinion that Robertson is partially disabled and should be able to return to work at an entry level in an alternative occupation.

Therefore, we find that Robertson is entitled to future loss of earnings, in the amount of $260,723.00.

Robertson has undergone five extensive surgical procedures and numerous hospitalizations, as well as numerous other medical treatments, as of November 27, 1984. Accordingly, we find that Robertson is entitled to $79,263.02 in past medical expenses. Additionally, we find that Robertson is entitled to $10,000.00 for future related medical expenses which are anticipated by his physician.

Robertson suffered a traumatic amputation of four fingers from his right hand, which was his dominant hand. The record shows that he has endured great pain due to this injury and will continue to suffer because of the neuromas on his hand, which cannot be eliminated by surgery. Robertson also suffers from nervousness and depression as a result of his injury.

He can no longer do many simple tasks, involving varying degrees of dexterity, such as buttoning his shirt or tying his shoes. His hand is substantially disfigured and only marginally useful.

We find that Robertson is entitled to $400,000.00 for general damages, including pain and suffering, past and future, permanent disability, disfigurement, mental anguish and embarrassment.

We hold that Superior is liable and indebted unto Robertson in the amount of $520,807.22 ($801,241.88 less 35%, the degree of fault attributable to Robertson).

## INTERVENTION

Employers Insurance of Wausau (Wausau) has intervened in this action, seeking to recover workman's compensation and medical payments made to and on behalf of Robertson, who was an employee of the intervenor's insured, Hunt, at the time of Robertson's injury.

We find that Wausau has paid $79,145.02 in medical and related expenses, as of November 27, 1984; and $26,527.36 in workman's compensation benefits, as of August. 14, 1984. We also find that Wausau continues to pay weekly workman's compensation benefits at the rate of $163.00 per week.

Wausau shall be reimbursed by priority, solely out of the reduced proceeds for the medical expenses and lost wages portion of the judgment awarded to Robertson, for all compensation and medical expenses actually paid by Wausau. *Fontenot v. Hanover Insurance*, 385 So.2d 238 (La.1980).

A judgment shall be submitted to this court in accordance with this opinion within ten days of the signed date.