Lawrence P. HEBERT

v.

OUTBOARD MARINE CORPORATION, et al.

No. 83–5095.

United States District Court,
E.D. Louisiana.

July 10, 1986.

William P. Rutledge, Law Office of Domengeaux & Wright, New Orleans, La., for plaintiff, Lawrence P. Hebert.

C.G. Norwood, Jr. and Eric Shuman, Law Office of McGlinchey, Stafford, Mintz, Cellini & Lang, New Orleans, La., for defendant, Outboard Marine Corp.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

PATRICK E. CARR, District Judge.

Plaintiff, Lawrence Paul Hebert, brought this action to recover damages for personal injuries resulting from a boating accident. The only defendant remaining at the time of trial was Outboard Marine Corporation ("OMC").[1] Plaintiff seeks to impose liability on the manufacturer of the outboard motor involved based on principles of negligence and strict products liability.

This matter was tried to the Court without a jury. After considering the pleadings, the testimony of the witnesses, the documents in evidence, and the law applicable to this case, the Court makes the following findings of fact and conclusions of law in accordance with Rule 52 of the Federal Rules of Civil Procedure.

Plaintiff is a 21 year old male who was born and raised in Pierre Part, Assumption Parish, Louisiana. He completed the seventh grade before dropping out of school to go to work. Although plaintiff completed a course in welding at Morgan City Trade School, his employment history is limited to fishing, skinning catfish and picking moss.

On December 29, 1982, plaintiff and his young nephew, Kenneth Blanchard, were returning from Lillian's Store in Pierre Part in a home-made skiff owned by plaintiff and built by plaintiff's second cousin, Ronald Hebert. The boat was powered by a 35 horsepower Evinrude outboard motor

---

1. Defendant, Dow Chemical, U.S.A. ("Dow"), was dismissed by summary judgment. Defendant, Diamond Services Corporation ("Diamond Services"), was dismissed upon joint motion of plaintiff and Diamond Services Corporation.

manufactured by the defendant. The path taken by plaintiff on Lake Verret was known by him to contain underwater obstructions. While travelling at planing speed plaintiff's boat struck a log piling which was lodged in the bed of the lake at one end and which protruded slightly above the water but was covered periodically by wave action at the other end. Upon impact with the log the motor cover flew off; the transom of the boat cracked, breaking at the point where the motor had been clamped to the transom; and the motor was propelled into the boat. The flywheel, which had become exposed when the cover came off of the motor, came into contact with plaintiff's left arm.[2]

As a result of this accident, plaintiff's dominant left arm was severely mangled. He has experienced muscular atrophy of approximately 50% in the left arm, which is now nonfunctioning for fine activities requiring use of two hands. The left arm can be used only for gross activities or in assisting the right arm and has suffered extensive scarring and disfigurement. The injury caused by this accident has rendered plaintiff's left arm 90% disabled and resulted in a 55% permanent partial disability for a 21 year old left-handed laborer. There is no surgical procedure available to foster improvement of plaintiff's condition. Future medical treatment is limited to exercise and medication to prevent pain and reduce inflammation.

Plaintiff advances three theories of recovery. First, he contends that the latch mechanism of the motor was defective because it was *capable* of being adjusted to a loose position. Second, plaintiff alleges that defendant was negligent in designing and manufacturing the latch. Finally, plaintiff argues that defendant was negligent for failing to warn of the dangerous condition.

The motor in question was purchased on January 22, 1982, by plaintiff's brother, Joseph "Jojo" Hebert, on plaintiff's behalf. [Defense Exhibit D–23]. At the time of the purchase, Joseph Hebert signed an Evinrude Motor Registration Card acknowledging receipt of the owner's/operator's manual. [Defense Exhibit D–24]. Plaintiff testified that he did not know whether or not his brother actually received a manual, but that in any event plaintiff did not see or read such manual.[3] The Court finds that Joseph Hebert did, in fact, receive an owner's/operator's manual and that plaintiff failed to secure and read said manual.

The latch mechanism in question consists of two parts. The body of the motor contains a lever [Defense Exhibits D–11 and D–12] which fits into a cavity in a mechanism attached to the molded fiberglass cover. [Defense Exhibits D–19, D–20, and D–21]. The latch assembly in the cover is manufactured with a "star washer" held in place by a bolt. [Defense Exhibits D–5 and D–21]. This latch mechanism was designed to be adjustable in order to facilitate manufacturing convenience. Before each motor leaves the manufacturing site, the latch assembly is fastened into a secure position to prevent movement of the motor cover, and the latch is inspected to insure that the bolt is neither too loose nor too tight. There is no reason for the purchaser of a motor to adjust the latch position.

The testimony of plaintiff's witnesses was replete with inconsistencies, confusion and falsehoods. There was conflicting testimony regarding when and what repairs were made to the motor in question. On August 23, 1982, while the motor was still under warranty, the power pack was replaced by Breaux & Daigle, Inc. [Defense Exhibit D–25]. Plaintiff testified that the plugs may have been changed before the accident, and there was contradictory testimony regarding possible repairs to the

---

**2.** The motor's propeller also made a gash in plaintiff's right buttock. However, plaintiff is not seeking recovery for this injury.

**3.** Plaintiff entrusted the purchase and pick-up of the motor to his brother, who, according to

plaintiff, had a mental deficiency such that 60% of his brain did not function properly and who the Court notes had little coherent recollection of events surrounding the purchase and/or maintenance of the motor.

gears. Plaintiff denied that any work was done on the cylinder head, and all of the witnesses denied adjusting the latch mechanism.

Yet, at the time of trial the latch assembly on the cover did not contain a "star washer" and was in such a state of maladjustment that the motor cover came off easily with a small amount of applied force. The imprint of a "star washer" indicated that at some time the latch assembly was in its most secure position. [Defense Exhibit D–17]. The bolt which would have secured the missing washer showed signs of the application of a wrench, and the cover had been loose for a prolonged period of time causing ridges in the aluminum where the cover rubbed.

In addition to the missing "star washer" the motor showed other signs of repair, tampering or misuse. For example:

a) there was a Johnson bolt in the place of an Evinrude bolt on one cylinder;

b) scratch marks on various bolts indicated the application of tools in an apparent attempt to remove the cylinder head;

c) an electric starter was added; [4]

d) there were several improperly placed screws;

e) one of the high tension leads had been replaced;

f) the latch lever had been bent for quite some time causing scrape marks; and

g) the tilt rod had been improperly placed.

The chain of custody of the motor is also the subject of controversy. The testimony of Thomas Landry and Cleveland Blanchard suggests that the motor was never used after the accident. According to these witnesses the motor was stored at plaintiff's father's house until it was delivered to the office of plaintiff's former counsel. However, plaintiff testified that after the accident, but before he or his family knew that a lawsuit might ensue, Breaux & Daigle repaired the gears that had been damaged in the accident because his brother, Jojo, wanted to use the motor.

Plaintiff also testified that he installed motors using only the clamps and that to his knowledge motors are not usually bolted to the transom. Despite this testimony and a stipulation by the parties that the motor was not, in fact, bolted to the transom at the time of the accident, thread marks indicated that the motor was bolted at some time.[5]

In addition to the injuries sustained in the boating accident, plaintiff also injured his left arm approximately one year later when his truck hit the side of the road and flipped over. In responding to questions by his doctor, to inquiries during his deposition, and in his response to interrogatories, plaintiff denied having been involved in any accident other than the one sued upon. During the course of his testimony, plaintiff gave three different reasons for lying about the accident during his deposition. First, he said that he was nervous in the deposition. Later, he said that "maybe [he] didn't think about it." Finally, he admitted that he lied because he "felt [he] wouldn't get a fair trial if they would have found out [he] got ... his arm broken again in a truck accident." Considering the many discrepancies in plaintiff's testimony and his demeanor on the stand, the Court finds that plaintiff is unworthy of belief.

The Court further finds that when the motor left the defendant's custody, the "star washer" was in place and the latch was in its most secure position. There is insufficient evidence to determine when the latch was disassembled or in what condition the latch existed at the time of the

---

4. When asked whether the motor had an electric or manual starter, plaintiff acted confused, claiming at times that he could not remember. Yet, he clearly remembered, without hesitation, that a motor he owned four or five years before he purchased the one in question had a manual starter.

5. The owner's/operator's manual recommends bolting the motor to the transom "[t]o prevent lateral movement or loss of motor overboard." [Defense Exhibit D–22, page 13.]

accident. No evidence was presented to establish whether the cover could have come off of the motor upon impact even if the latch was securely fastened. Although plaintiff's expert testified that a secure latch would provide sufficient rigidity to keep the cover in place, this bald statement was not supported by prior experience, scientific studies, impact analysis, etc., and is, therefore, rejected.

■ A maritime tort involving pleasure craft, even if committed on state territorial waters, falls within the Court's admiralty jurisdiction and is measureable by the standards of maritime law. *Foremost Insurance Company v. Richardson*, 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982); *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959); *Cohen v. S/S Consumer*, 746 F.2d 1069 (5th Cir.1984). Therefore, the Court has jurisdiction pursuant to 28 U.S.C. § 1333.[6]

Strict products liability has been recognized as part of the general maritime law. *East River Steamship Corp. et al. v. Transamerica Delaval, Inc.*, 54 U.S.L.W. 4649, —— U.S. ——, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986); *Lewis v. Timco, Inc.*, 697 F.2d 1252 (5th Cir.1983). However, the parameters of the strict liability doctrine in admiralty cases have not been specifically defined in the Fifth Circuit. Other circuits have held that the Second Restatement of Torts should be applied as the law of strict products liability in cases arising in admiralty.[7] *Pan-Alaska Fisheries, Inc. v. Marine Const. & Design Co.*, 565 F.2d 1129 (9th Cir.1977); *Lindsey v. McDonnell Douglas Aircraft Corp.*, 460 F.2d 631 (8th Cir.1972); *Emerson G.M. Diesel v. Alaskan Enterprise*, 732 F.2d 1468 (9th Cir.1984); *East River S.S. Delaval Turbine*, 752 F.2d 903 (3rd Cir.1985); *Ocean Barge Transport Co. v. Hess Oil Virgin Islands Corp.*, 726 F.2d 121 (3rd Cir.1984); *Schaeffer v. Michigan-Ohio Navigation Co.*, 416 F.2d 217 (6th Cir. 1969); *McKee v. Brunswick Corp.*, 354 F.2d 577 (7th Cir.1965); and *Sanderlin v. Old Dominion Stevedoring Corp.*, 385 F.2d 79 (4th Cir.1967).

Where there is no uniform federal rule, courts applying maritime law may adopt state law by express or implied reference or "by virtue of the interstitial nature of federal law." *Palestina v. Fernandez*, 701 F.2d 438 (5th Cir.1983). Because Louisiana law is congruent with the principles enunciated in Section 402–A of the Restatement of Torts (Second), the Court finds that Louisiana law should be applied.

■ Therefore, in order to recover from the defendant as the manufacturer of the motor in question, plaintiff must prove:

1) That his injury or damage resulted from the condition of the product;

2) That the condition made the product unreasonably dangerous to normal use; and

3) That the condition existed at the time the product left the control of the manufacturer or supplier.

*Bell v. Jet Wheel Blast, Div. of Ervin Ind.*, 462 So.2d 166 (La.1985); *Robertson, et al. v. Superior PMI, Inc.*, 791 F.2d 402 (5th Cir.1986); and *Halphen v. Johns-Manville Sales Corp.*, 484 So.2d 110 (La.1986).

---

6. Plaintiff originally sued under the Court's diversity jurisdiction requesting a jury. However, with the addition of Diamond Services as a defendant, diversity was destroyed. Plaintiff then proceeded under the Court's admiralty jurisdiction.

7. Section 402A of the Restatement provides:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller. Restatement (Second) of Torts § 402A (1965).

A product may be unreasonably dangerous because of its design for one of three reasons:

1) A reasonable person would conclude that the danger-in-fact, whether foreseeable or not, outweighs the utility of the product, i.e. the product is unreasonably dangerous per se;

2) Although the product may not be unreasonably dangerous per se, safer alternative products were available; or

3) Although the product's utility outweighs its danger-in-fact, there was a feasible way to design the product with less harmful consequences.

*Halphen, supra.* Of course, "the manufacturer is under no duty 'to make a product that will last forever or will withstand abuse or lack of maintenance' or that is 'foolproof' ... nor one whose component 'parts do not wear out.'" *Scott v. White Trucks,* 699 F.2d 714, 717 (5th Cir.1983).

It is the opinion of this Court that the *capability* of the latch to be adjusted, in and of itself, is not a defect. In order to prevail, therefore, plaintiff must prove one of two things: (1) that the latch design and manufacture was so defective it would have become loose in normal use; or (2) that the cover would have come off on impact even in its most secure position. Because of the lack of credibility of plaintiff and his witnesses, the Court finds that plaintiff failed to establish either.

Plaintiff also failed to prove negligence on the part of the defendant for manufacturing a defective product. Strict liability and negligence concepts are substantially the same. The only difference is that to prove negligence the plaintiff must establish that the defendant had actual or constructive knowledge of the risk involved. *Bridges v. Chemrex Specialty Coatings, Inc.,* 704 F.2d 175 (5th Cir.1983). Since there was no risk, there could have been no knowledge.

Judgment shall be rendered accordingly.