Jacqueline ANDERSON, Personal Representative of the Estate of Curtis Anderson, Deceased, and Martha Brower, Personal Representative of the Estate of Steven Brower, Deceased, and Mary E. Miller, Personal Representative of the Estate of Michael Stevenson, Deceased, and Harvie C. Willsey, Executor of the Estate of Harvie L. Willsey, Deceased, Plaintiffs,

v.

WHITTAKER CORPORATION, a California corporation, and Trojan Yacht Corporation, a Pennsylvania corporation, d/b/a Trojan Yacht Division, Whittaker Corporation, and Trojan Yachts Co., a California corporation, d/b/a Trojan Yacht Division, Whittaker Corporation, jointly and severally, Defendants.

and

WHITTAKER CORPORATION, Third–Party Plaintiff in Admiralty,

v.

Claude C. BOLES, Third–Party Defendant.

No. G81–98 CA5.

United States District Court, W.D. Michigan, S.D.

July 20, 1988.

John L. Coté, E. Lansing, Mich., Richard Swaney, Holland, Mich., for plaintiffs.

Richard B. Baxter and Joel E. Krissoff, Grand Rapids, Mich., for defendant Whittaker.

John L. Collins and Charles Barbieri, Lansing, Mich., for third-party defendant Boles.

## OPINION AND ORDER REGARDING DAMAGES

MILES, Senior District Judge.

The instant case is now before this Court following the second portion of a bifurcated bench trial. After the first bench trial on the issue of liability, the Court determined that defendant Whittaker Corporation, third-party defendant Claude Boles, and the plaintiffs' decedents each bore a degree of responsibility for the disappearance of the Sea Mar III and its crew, 692 F.Supp. 734 (W.D.Mich.1987). Although additional discussion of the facts and applicable law are contained in this Court's findings of fact and conclusions of law regarding liability, the Court now addresses the task of determining the appropriate measure of damages to be awarded to the plaintiffs. Accordingly, the Court now enters its findings of fact and conclusions of law on the matter, pursuant to Fed.R. Civ.P. 52(a).

At the most recent trial, there were relatively few factual controversies presented for the Court's resolution. The parties did, however, raise several significant legal questions that must be answered before damages may be determined. In this opinion, rather than separately setting out the issues of fact and law, the court will incorporate its resolution of the factual issues in its discussion of the legal questions.

I. *Source of jurisdiction and applicable substantive law*

The parties have asked the Court to decide, as a threshold matter, whether the source of the Court's jurisdiction over this case lies in admiralty or at law. They assert that the choice of jurisdiction will determine which body of law, state law or federal maritime law, governs this controversy. Defendants in particular claim that with respect to several of the specific issues now before this Court, the results may depend upon which body of authority is applied.

The complaint originally filed in this case alleged two separate grounds for federal jurisdiction. It stated that jurisdiction properly will lie because of diversity of citizenship, under 28 U.S.C. § 1332, and because the case arose under the Court's admiralty or maritime jurisdiction, under 28 U.S.C. § 1333(1). The existence of diversity jurisdiction is apparent from the face of the complaint, and has never been questioned. On the other hand, the Court has not made an express finding that the case arose out of circumstances that justify the exercise of maritime jurisdiction.[1]

■ Under the well-established precepts of *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), a finding that jurisdiction rests upon diversity of citizenship alone usually will require the application of state substantive law. By contrast, if a case arises from conduct that brings it within the reach of the court's admiralty jurisdiction, federal maritime law will govern the rights of the parties, even if an independent source of jurisdiction exists. *Kermarec v. Compagnie Generale Transatlantique*, 358 U.S. 625, 628, 79 S.Ct. 406, 408, 3 L.Ed.2d 550 (1959); *see also Kilpatrick Marine Piling v. Fireman's Fund Insurance Co.*, 795 F.2d 940, 948 n. 10 (11th Cir.1986); *Continental Casualty Co. v. Canadian Universal Insurance Co.*, 605 F.2d 1340, 1344 (5th Cir. 1979), *cert. denied*, 445 U.S. 929, 100 S.Ct. 1317, 63 L.Ed.2d 762 (1980). The Court

therefore must decide whether this case falls within the purview of maritime law. Based upon its view of the applicable law and the relevant circumstances, the Court is convinced that it does.

The Supreme Court has ennunciated essentially a two-part test for determining whether admiralty jurisdiction may be exercised on a given set of facts. At the outset, the court must decide whether the underlying occurrence had a maritime locality. *Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 253, 93 S.Ct. 493, 497, 34 L.Ed.2d 454 (1972). In a case involving negligence, the so-called "locality test" is applied to the place where the alleged negligence took effect. *Id.* at 266, 93 S.Ct. at 503. The locality test certainly has been satisfied in the case at hand, insofar as the wrongful acts cited by this Court culminated in the loss of a boat and its crew on Lake Michigan.

■ For torts occurring on navigable waters within the United States, however, an additional qualification must be met before maritime jurisdiction will be found to lie. The wrong sued for must bear a "significant relationship to traditional maritime activity." *Id.* at 268, 93 S.Ct. at 504. The traditional maritime activity need not be strictly commercial in nature; courts frequently have extended maritime jurisdiction to situations involving pleasure craft. *See Foremost Insurance Co. v. Richardson*, 457 U.S. 668, 674, 102 S.Ct. 2654, 2658, 73 L.Ed.2d 300 (1982); *see also Truehart v. Blandon*, 672 F.Supp. 929 (E.D.La.1987); *Hebert v. Outboard Marine Corp.*, 638 F.Supp. 1166 (E.D.La.1986).

The *Foremost* case involved a collision between two pleasure boats allegedly resulting from a navigational error. In that case, the Supreme Court made it clear that the critical question was whether the exercise of admiralty jurisdiction was necessary to serve the federal interests of protecting the smooth operation of maritime commerce, and of providing uniform standards to govern maritime duties. *See* 457 U.S. at

---

**1.** This point was assumed, but not expressly decided, in the earlier findings and conclusions

rendered by the Court.

674–77, 102 S.Ct. at 2658–59. The *Foremost* Court found that uniform "rules of the road," governing the operation of noncommercial as well as commercial craft, were necessary to insure the safe passage of all vessels through shared waterways. *See id.* This Court finds that the interests cited in *Foremost* support the exercise of maritime jurisdiction in the instant case as well. Just as a negligently driven pleasure boat may endanger other boats in the vicinity, a boat that is unmanageable, unwieldy or foundering due to defects in the hull is likely to be a hazard to vessels moving around it. The product involved in this case was designed for use in navigable waters that are often crowded with commercial and noncommercial vessels alike. There undeniably is a strong federal interest in providing uniform standards for the design and manufacture of products with such a potential to affect traditional maritime activities.

The plaintiffs have argued that the instant case is "essentially" a products liability case, insofar as suit has been brought against the boat's manufacturer. They claim that the case therefore arises more naturally out of state law than maritime law. The fact that products liability is involved, however, does not affect the applicability of maritime law. Products liability concepts, based both upon negligence and upon strict liability, have long been incorporated in admiralty law. *East River S.S. Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 106 S.Ct. 2295, 2299, 90 L.Ed. 2d 865 (1986). The design or manufacture of a defective product certainly may qualify as a maritime tort. *See id.; see also Schaeffer v. Michigan–Ohio Navigation Co.,* 416 F.2d 217, 221 (6th Cir.1969); *Jig The Third Corp. v. Puritan Marine Insurance Underwriters Corp.,* 519 F.2d 171, 175 (5th Cir.1975), *cert. denied,* 424 U.S. 954, 96 S.Ct. 1429, 47 L.Ed.2d 360 (1976). Various courts have exercised admiralty jurisdiction over claims involving the manufacture or design of products used in boats, where the other qualifications for maritime jurisdiction have been met.[2] *See, e.g., Emerson G.M. Diesel, Inc. v. Alaskan Enterprise,* 732 F.2d 1468, 1470 n. 1 (9th Cir. 1984) (parts used in diesel engines); *Sperry Rand Corp. v. Radio Corp. of America,* 618 F.2d 319, 322 (5th Cir.1980) (components of gyro-pilot steering system); *Hebert v. Outboard Marine Corp.,* 638 F.Supp. 1166, 1170 (E.D.La.1986) (outboard motor).

This Court is impressed with the fact that this case involves the manufacture and design of a boat, a product that is inherently maritime in character. The design defects complained of bear directly upon the boat's ability to function as a boat, and to withstand operations on water. The suit was brought on behalf of the boat's operators, who had a right to rely upon the boat's integrity under foreseeable marine conditions. The risks posed by the defect were that of swamping, sinking, and loss of crew and passengers on the water; these risks are exclusive to a maritime locale. These characteristics distinguish this case from many of the products liability cases in which admiralty jurisdiction was found not to lie. *See, e.g., Harville v. Johns–Manville Prods. Corp.,* 731 F.2d 775, 783–85 (11th Cir.1984) (no maritime jurisdiction over asbestos exposure case brought by land-based ship repair workers; plaintiffs found to have alleged injuries of a non-maritime nature, caused by products not designed exclusively for maritime use).

## II. *Measure of wrongful death damages*

Having determined that maritime law governs this action, the Court concludes that the case may be characterized as a maritime wrongful death claim, as recognized in *Moragne v. States Marine Lines, Inc.,* 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970). The Supreme Court in that

---

**2.** Plaintiffs have raised the argument that because they have access to a remedy under state products liability law, this in some way lessens the federal interest over the controversy. The analysis employed in *Foremost,* however, makes it clear that the existence of a parallel state remedy is of no consequence. If a sufficient federal interest exists to justify the exercise of maritime jurisdiction, the application of maritime law will follow as a matter of federal supremacy. *See* 457 U.S. at 674–75, 102 S.Ct. at 2658.

case recognized the existence of such an action, as part of the general maritime law, for a death caused by a breach of maritime duties. *See id.* at 409, 90 S.Ct. at 1792.

The *Moragne* decision did not delineate all of the contours of the maritime wrongful death action. Rather, the Court there specifically left elaboration upon the finer points, such as the type of damages that might be recovered, and the specific schedule of beneficiaries, to "further sifting through the lower courts." *Id.* at 408, 90 S.Ct. at 1792. In the subsequent case of *Sea–Land Servs., Inc. v. Gaudet,* 414 U.S. 573, 584–85, 94 S.Ct. 806, 814–15, 39 L.Ed.2d 9 (1974), the Court explicitly stated that the damages recoverable in a *Moragne* action, under appropriate circumstances, include each of the following: loss of support; loss of services; and loss of society.

Claims have been made in the instant case for each of the types of damages listed above. Separate issues of law and fact surround the Court's determinations upon the various claims.

A. Loss of support and services

■ Under *Gaudet,* the dependent survivors of each decedent are entitled to an award for the loss of all financial contributions decedent would have made to them, had he lived. 414 U.S. at 584–85, 94 S.Ct. at 814–15. They also are entitled to the monetary value of all services that decedent would have performed; including the nurture, training, education and guidance of decedent's children. *Id.* at 585, 94 S.Ct. at 815. In this case, damages for loss of support and services are sought only for decedents Anderson and Brower, on behalf of their dependent children and widows.

On this issue plaintiffs principally rely upon the testimony of Dr. John Henderson, a consulting economist and professor of economics at Michigan State University. Dr. Henderson provided the Court with figures that purport to represent the present value of decedents' past and future earnings. The figures, according to Dr. Henderson's testimony, were derived in the following manner. First, earnings of each

decedent over the past few years were derived from income tax records. Based upon these figures, Henderson computed a projected growth rate; this was the rate by which he postulated each decedent's "gross earning capacity" would increase each year over the rest of his work life. Against each year's "gross earning capacity" Henderson set a "personal consumption" allowance: this amount is a percentage of gross earnings, adjusted from a low of around 22% (26% for Anderson) to 30% as all children reached majority. The net result of these computations were each year's "net earning capacity" figure. Henderson discounted each of these amounts to present value. The total lost earnings for decedent Anderson was computed to be $1,645,304.30; for decedent Brower, $1,794,800.40.

Defendants offered no independent proofs of lost earning capacity. They did not dispute the evidence of what decedents earned during the last few years of their lives; they also did not dispute Henderson's assumptions regarding each decedent's work life expectancy. Defendants did object, however, to the projected growth rate found to apply, and to the method by which the rate was calculated.

■ The Court cannot accept as credible Dr. Henderson's contention that each decedent's earnings would have increased by a steady 9% or 10% every year for the rest of decedents' work lives. These projected growth rates were reached, in each case, merely by extrapolating the decedents' increases in earnings over a very few recent years.[3] The Court finds it significant that each decedent's earnings were derived solely from conducting sales in power boats. These products are luxury items, which are susceptible to changing economic and social conditions. Although earnings in the sales industry can fluctuate widely from year to year, resulting in sudden increases, there also can be sudden setbacks. Thus, the Court finds that plaintiffs' projection of constant, steady growth at the rates projected by Henderson is too speculative

---

**3.** The projected growth rate therefore included a projection for future inflation.

to be relied upon. A more conservative growth rate is appropriate.

■ The parties provided the Court with no other evidence of projected future inflation or a probable growth rate for earnings. The Court finds that a reasonable assumption for future annual inflation and wage growth is 7%. Dr. Henderson used a 5% discount rate in his computations for present value; that amount is acceptable to this Court, and accords with rates that recently have been used in the courts of this state. *See Wilson v. Beebe,* 770 F.2d 578, 590 (6th Cir.1985). Therefore, in order to calculate past earnings, the Court has applied a 7% projected growth rate to each decedent's 1979 earnings. In its calculation of future earnings, the Court has offset projected growth at 7% against the discount to present value at 5%.

The Court accepts Dr. Henderson's assumptions regarding the extent of each decedent's worklife, and the applicable rates of personal consumption allowances. Based upon these assumptions, the Court's calculations yield the following results: for decedent Brower, past earnings of $224,-322.25, future earnings of $1,147,285.35; for Anderson, past earnings of $158,635.79, future earnings of $887,921.88.[4]

Plaintiffs on behalf of Anderson and Brower also have made claims for loss of services. Based upon the evidence offered by each of the surviving widows, the Court finds that the following amounts properly reflect the present value of those services: Anderson, $50,000; Brower, $75,000.

**B. Loss of society**

Damages for loss of society have been requested by the survivors of all four decedents. As stated, the Supreme Court in *Gaudet* expressly recognized that non-pecuniary damages of this type are recoverable under the maritime wrongful death remedy. *See* 414 U.S. at 584, 94 S.Ct. at 814. The Court described these damages as those designed to compensate for the loss of "the broad range of mutual benefits each family member receives from the others' continued existence, including love, affection, care, attention, companionship, comfort, and protection."[5] *Id.* at 585, 94 S.Ct. at 815. In *Gaudet,* the Court allowed an award of loss of society damages to the widow of a longshoreman who had been injured on an unseaworthy vessel. *See id.* at 574, 94 S.Ct. at 809. The Court made no ruling, however, regarding the scope of the class of beneficiaries entitled to receive this type of damages.

Defendants in the instant case have argued that loss of society damages ought to be limited to *dependent* survivors of the four decedents. Such a conclusion would limit the class of beneficiaries in this case to the widows and children of decedents Brower and Anderson; it would exclude the non-dependent parents of decedents Stevenson and Willsey, who are the only claimants seeking damages for the deaths of those two crew members, and for whom loss of society damages constitute the bulk of the claims made.

Matters bearing upon this controversy have received attention from the courts of appeals. In the recent Fifth Circuit case of

---

4. The Court based its projections upon the 1979 salaries for each decedent, per Henderson's testimony (Anderson: $18,250.00; Brower: $24,-483.37).

 No lost wages were awarded for the balance of 1980, as the unearned wages for the balance of the year (computed based upon a 7% projection from 1979, less the amounts already earned, per Henderson testimony) in each case was exceeded by decedent's personal consumption allowance.

 The Court assumed that the decedents' personal consumption allowances would have shifted upward as follows: Anderson, 26% (1980–1997) to 30% (1998–2016); Brower, 22% (1980–1993); 26% (1994–1997); 30% (1998–2015).

5. The Court in *Gaudet* was careful to make a distinction between loss of society, which is described above, and the survivors' mental anguish and grief, which is not compensable under maritime law. *See* 414 U.S. at 585 n. 17, 94 S.Ct. at 815 n. 17. In the instant case, plaintiffs presented a certain amount of evidence that was probative only of the fact that the plaintiffs suffered grief; in particular, the testimony of Dr. Vincent Cornellier, who treated plaintiff Jacqueline Goodson, had no other relevance that this Court could ascertain. The Court explicitly recognizes that these injuries are not compensable, and it has relied upon none of the evidence of plaintiffs' mental anguish in reaching its findings with regard to the loss of society claims.

*Sistrunk v. Circle Bar Drilling Co.,* 770 F.2d 455 (5th Cir.1985), the court was called upon to decide whether the nondependent parents of two seamen who had been survived by dependent widows and children, were entitled to loss of society damages on their general maritime claims of unseaworthiness. The court of appeals held that they were not; in so doing, it relied upon the "twin aims" of maritime law, as expressed in *Moragne:* that of achieving uniformity in the exercise of admiralty jurisdiction, and of providing special solicitude to seamen. *Id.* at 458 (citing *Moragne,* 398 U.S. at 386–88, 401, 403, 90 S.Ct. at 1780–81, 1788, 1789). The *Sistrunk* court found that allowing recovery to this class of survivors would thwart the aims of uniformity, in that the availability of nonpecuniary damages would therefore vary according to such factors as whether the injury had occurred within a state's territorial waters, or whether it was the result of unseaworthiness as opposed to negligence.[6] *See id.* at 459. It also concluded that the "special solicitude" guaranteed to seamen under *Moragne* and *Gaudet* was intended to apply principally to dependent survivors. *Id.* at 460. The holding in *Sistrunk* subsequently was relied upon in *Patton–Tully Transp. Co. v. Ratliff (In re Patton–Tully Transp. Co.),* 797 F.2d 206 (5th Cir.1986). In that case, the court allowed the mother and siblings of a seaman to collect loss of society damages under the general maritime law. The court expressly conditioned its holding upon the fact that the survivors were financially dependent upon the deceased. *Id.* at 212–13.

The Ninth Circuit in *Evich v. Connelly,* 759 F.2d 1432 (9th Cir.1985), faced the issue in terms of whether nondependent siblings of a deceased seaman could maintain a maritime wrongful death action. The court did not specifically address the question of loss of society damages, but broadly held that recovery for maritime wrongful death is available only to dependent relatives. *Id.* at 1433. In so holding, the court made analogy to the federal Death on the High Seas Act (DOHSA), 46 U.S.C.App. § 761 et seq., which allows recovery only for the benefit of a specific class of beneficiaries not including nondependent siblings. *See* 759 F.2d at 1433.

The most recent decision on the subject, as well as the case that is the most apposite factually, is *Truehart v. Blandon,* 672 F.Supp. 929 (E.D.La.1987). This case arose out of a maritime wrongful death action, brought by the parents of a young man who was killed because of the negligent operation of a pleasure boat. The decedent was not survived by any dependent relative. The court denied the parents' claims for loss of society damages, holding that the proper limit upon the *Moragne* remedy was achieved by requiring that a claimant thereunder have been financially dependent upon his decedent. The court looked carefully at the recent Fifth Circuit authority, specifically *Sistrunk* and *Patton–Tully,* and concluded that dependence upon the deceased was the crucial element in each of these cases. *See id.* at 935.

■ The Sixth Circuit Court of Appeals has made no definitive statement on the matter.[7] This Court, having surveyed the authority from other circuits as well as the

---

6. The court noted that the Death on the High Seas Act (DOHSA), 46 U.S.C.App. § 761, would apply in the case of a death occurring outside of territorial waters, and that the Jones Act, 46 U.S.C.App. § 688, provided the remedy for deaths caused by negligence to seamen acting within the scope of their duties. It noted further that neither of these statutory schemes provided nondependents with a loss of society remedy. *See* 770 F.2d at 459.

7. Each side in this dispute has cited the case of *In re Cambria S.S. Co.,* 505 F.2d 517 (6th Cir. 1974), *cert. denied,* 420 U.S. 975, 95 S.Ct. 1399, 43 L.Ed.2d 655 (1975), as supportive of its arguments. The Court concludes, however, that this

case is not authoritative regarding the matter at issue here. In *Cambria S.S.* the court was concerned with whether nondependent siblings could recover for the loss of what they might have inherited from a deceased sibling who had left no dependent relatives. The court rejected this theory of recovery; it premised its holding upon the great uncertainty involved in predicting how a decedent would have chosen to distribute his estate. *See id.* at 524. The Court accordingly dismissed the siblings' claims *in toto;* it did not reach the question of what, if any, other measure of damages was available to the nondependent survivors. *See id.*

Supreme Court's statements in the area, finds that maritime wrongful death recovery is properly limited to dependent survivors. In so finding, the Court concludes that the reasoning set forth in *Truehart* is persuasive. It finds that the particular reasons relied upon by that court, including the promotion of uniformity in maritime law, and the need for the courts to provide reasonable limits on *Moragne* recoveries, are well taken. *See* 672 F.Supp. at 936–38.

The plaintiffs here urge the Court to derive a list of beneficiaries under *Moragne* from the language of either DOHSA or the Federal Employers' Liability Act, 45 U.S.C. § 51 et seq. (incorporated by reference in the Jones Act, 46 U.S.C.App. § 688). Both of these statutes, plaintiffs claim, permit parents to recover without an express showing of dependence. The Court finds that plaintiffs, in making this argument, advocate that it adopt language from either statute without reference to how that language fits into each statute as a whole. In DOHSA, for example, although the statute explicitly speaks in terms of damages for the benefit of "decedent's wife, husband, parent, child, or dependent relative," the requirement of dependence is written into the statute, insofar as damages are expressly limited to "pecuniary loss." 46 U.S.C.App. §§ 761, 762. Damages under the Jones Act, similarly, are limited to the sort of pecuniary losses that only dependents are likely to suffer. *See Sistrunk*, 770 F.2d at 459; *Morvant v. Construction Aggregates Corp.*, 570 F.2d 626, 633 n. 8 (6th Cir.), *cert. dismissed*, 439 U.S. 801, 99 S.Ct. 44, 58 L.Ed.2d 94 (1978). Each statute, therefore, sets up a scheme where *dependents* are protected, to the exclusions of other persons who may conceivably have suffered injury.

There is no question in this case but that all of the decedents' survivors, including the parents, have suffered a loss.[8] The Court in no way disputes this. It notes, however, that it is inherent in the nature of wrongful death remedies that not every survivor is entitled to recover monetary damages. A line must be drawn; without the express terms of a statute to guide the Court, it must draw a boundary that is most in line with the purposes underlying creation of the remedy. This Court is in agreement with *Truehart* in concluding that a limit based upon dependence is in line with the philosophy of *Moragne* and subsequent cases. *See* 672 F.Supp. at 938.

Plaintiffs argue that in limiting the wrongful death remedy to the dependents of the deceased, this Court is undercutting the "progressive" aims of *Moragne* and *Gaudet*. It is plaintiffs' assertion that those cases evinced an intent by the Supreme Court to bring admiralty law into the "modern world," which plaintiffs assert means allowing recoveries that are more in line with "enlightened" state wrongful death statutes, rather than the older schemes contained in the Jones Act and DOHSA. This interpretation of the trend in maritime wrongful death law, however, is not reinforced by the more recent case of *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978). In *Higginbotham*, the Court ruled that in a case of death occurring on the high seas, the pecuniary remedies allowed under DOHSA may not be supplemented by loss of society damages under general maritime law. *Id.* at 624, 98 S.Ct. at 2014. In so holding, the Court reaffirmed that lower courts should look primarily to DOHSA for guidance in shaping the general maritime death remedy. *Id.* It also made the observation that the seeming contradiction between *Gaudet*, which recognizes damages for loss of society, and DOHSA, which does not, may well be reconciled by limiting loss of society awards to amounts that are "symbolic," rather than constituting the bulk of recovery. *Id.* at 624 n. 20, 98 S.Ct. at 2014 n. 20. In so stating, the Court at

---

**8.** In this regard, the Court heard the testimony of members of each family, including the following: Mary Miller and Karen Evinger, the mother and sister of decedent Stevenson; Barbara Monroe and Charles Brower, the parents of decedent Brower; Thomas Brower, brother of decedent Brower; Mardell Anderson and Ruth Hope, the mother and sister of decedent Anderson; Jodie Dees, the fiancee of decedent Willsey; Jacqueline Goodson, the widow of decedent Anderson; and Martha Walker, the widow of decedent Brower.

the very least was hinting that although loss of society compensates survivors for actual damages, with respect to the primary aims of maritime death actions (as stated in *Gaudet,* protection of dependents), these damages should not become the "tail wagging the dog." *See Gaudet,* 414 U.S. at 577, 94 S.Ct..at 811 (speaking of the "special solicitude" due to the dependents of sea-faring decedents); *see also Truehart,* 672 F.Supp. at 934, 936 (finding guidance in the "admonition" regarding loss of society damages found in *Higginbotham* ).

Accordingly, the Court finds that damages for loss of society are properly awarded to plaintiffs Jacqueline Goodson, widow of decedent Anderson, in her own behalf and on behalf of her minor son; and Martha Walker, widow of decedent Brower, in her own behalf and on behalf of her two minor children. On the basis of the evidence presented by those women, the Court concludes that an appropriate award for the Anderson estate is $100,000; for the Brower estate, $150,000.

## III. *Survival damages*

Plaintiffs also have asserted claims for decedents' pain and suffering prior to their deaths. This measure of damages, known as "survival damages," is available under the general maritime law. *Azzopardi v. Ocean Drilling & Exploration Co.,* 742 F.2d 890, 893 (5th Cir.1984). Survival damages may be sued for by any representative of a decedent, without reference to relationship, or dependence upon the deceased. *Evich v. Connelly,* 759 F.2d 1432, 1434 (9th Cir.1985). The measure of damages requested here includes the physical and mental pain that plaintiffs claim decedents suffered, as well as the terror, fright and shock that allegedly accompanied decedents' apprehension of imminent death.

The Court, in its earlier findings of fact, concluded that it was more probable than not that the Sea Mar suddenly capsized;

that decedents went down with the boat; and that the bodies were trapped inside the hull. Beyond that, the Court made no findings regarding the last events aboard the Sea Mar. The plaintiffs have proffered circumstantial evidence that they claim shows that decedents remained conscious for some time before eventually drowning. Defendants claim that plaintiffs have failed to prove it more likely than not that decedents underwent conscious pain and suffering.

Plaintiffs offered the testimony of Commander John Deck, a marine engineer, who ventured his opinion regarding the manner in which the Sea Mar sank.[9] Deck testified that according to his assumptions regarding the configuration of the Sea Mar, the boat probably remained buoyant for some time after capsizing. He opined that during this time, air would have been trapped inside the hull. Plaintiffs claim that Deck's conclusions show that it is likely that decedents were trapped inside the hull of the capsized boat, fully conscious, for some time before their deaths. The defendants objected to this testimony based upon relevance and foundation, claiming that Deck had inadequate firsthand knowledge of the structure of the Sea Mar to allow him to formulate such an opinion.

Plaintiffs also have offered the deposition testimony of Dr. Laurence Simson, M.D., a forensic pathologist. Dr. Simson testified to the physical processes involved in death by drowning. He described the two types of drowning, "dry lung" and "wet lung," and opined that in either type of situation, a drowning victim would likely remain conscious for no more than one-and-a-half to two minutes. (Simson deposition at 12, 14). He acknowledged that it is possible for humans to drown while unconscious for some reason other than lack of oxygen. (*Id.* at 28). His opinion regarding the degree of actual physical pain involved in drowning was, however, largely conjectural. (*Id.* at 17–18).

---

**9.** Commander Deck's expertise in the area of marine engineering was reviewed and approved by the Court in its earlier findings of fact.

■ The Court never has specifically found that the decedents died by drowning. Even if it assumes that they did drown, the court never specifically found that decedents more likely than not were *conscious* when that happened. The evidence gives equal support to the conclusion that decedents were struck by heavy furniture in the cabin when the boat capsized, or that they suffered sudden cardiopulmonary arrest when they were plunged into the water. The Court therefore does not find that the evidence supports an award for physical pain and suffering on the part of decedents. *Cf. Deal v. A.P. Bell Fish Co.*, 728 F.2d 717, 718 (5th Cir.1984) (survival damages for physical pain and suffering not supported, where there was no evidence that decedent was conscious at time of drowning).

■ One component of survival damages, however, is the fright, shock and terror felt by decedents who are in apprehension of imminent death, or who are faced with a situation involving life-threatening peril. This principle has explicitly been recognized both in admiralty law, and under the survival laws of various states. *See, e.g., Stissi v. Interstate & Ocean Transport Co.*, 590 F.Supp. 1043, 1048–49 (E.D.N.Y.1984), *rev'd in part on other grounds*, 765 F.2d 370 (2d Cir.1985) (complaint under general maritime law; court awarded compensation for mental pain and suffering due to decedent's emotional strain and fear of drowning); *Platt v. McDonnell Douglas Corp.*, 554 F.Supp. 360, 363 (E.D.Mich.1983) (Michigan law); *Pregeant v. Pan American World Airways, Inc.*, 762 F.2d 1245, 1249 (5th Cir. 1985) (Louisiana); *Shu–Tao Lin v. McDonnell Douglas Corp.*, 742 F.2d 45, 53 (2d Cir.1984) (New York). In such cases, the survivors are entitled to compensation for the decedent's "mental suffering, anxiety, suspense and fright." *Platt*, 554 F.Supp. at 363.

■ There is strong evidence in this case that the decedents experienced an acute awareness of their desperate situation prior to their deaths. The physical evidence presented during the liability trial included hatch covers that had been washed ashore; these hatch covers were located on the floor of the cabin, underneath heavy furniture. They therefore must have been removed intentionally. This indicates that the decedents were in the engine compartment, probably making frantic efforts to save themselves, prior to capsizing. This conclusion is reinforced by the fact that none of the four bodies ever has surfaced, thus indicating that all four were below deck at the time of death. Therefore, although no evidence convinces the Court that decedents suffered physical pain and suffering after capsizing, the Court finds it more likely than not that decedents suffered terror, fright and shock *before* capsizing.

The Court concludes that a proper measure of survival damages, on behalf of each decedent, is $30,000.

## IV. *Punitive damages*

Plaintiffs assert that the facts before the Court demonstrate that they are entitled to punitive damages. They claim that the evidence in the case shows conduct, on the part of defendants, that rises to the level of deliberate misconduct justifying such an award.

■ It has been recognized that punitive damages are recoverable under general maritime law. *See Evich v. Morris*, 819 F.2d 256, 258 (9th Cir.), *cert. denied*, — U.S. —, 108 S.Ct. 261, 98 L.Ed.2d 218 (1987); *In re Merry Shipping, Inc.*, 650 F.2d 622, 625 (5th Cir. Unit B 1981); *United States Steel Corp. v. Fuhrman*, 407 F.2d 1143, 1148 (6th Cir.1969), *cert. denied*, 398 U.S. 958, 90 S.Ct. 2162, 26 L.Ed.2d 542 (1970). Punitive damages are recoverable where there has been a showing of conduct that manifests a reckless or callous disregard for the rights of others, or that amounts to gross negligence, criminal indifference or actual malice. *Evich*, 819 F.2d at 258; *Merry Shipping*, 650 F.2d at 625. The existence of circumstances giving rise to liability for punitive damages is a question of fact. *Evich*, 819 F.2d at 259.

Evidence regarding punitive damages was offered during the first trial in the case, principally by way of a stipulation that was received as one of plaintiffs' exhibits.[10] Plaintiffs attempted at the subsequent trial to reopen the proofs on this subject; this request was denied by the Court, on the grounds that the plaintiffs already had received a full opportunity to develop the facts on the issue, and that they had represented to the Court that the matter had been sufficiently explored.

██ There are several points that plaintiffs rely upon in their request for punitive damages. First, they emphasize the fact that defendants since 1974 had notice of the fact that the hull vent defect in the F–32 could cause swamping and potential sinking, and that the situation posed a significant threat to the public. In spite of this, plaintiffs remind the Court, defendants did not institute a formal notification or recall campaign until 1978. Second, plaintiffs point out that the recall campaign, when instituted, consisted of letters sent by first-class mail, rather than by certified mail. The letters were sent only to dealers, first owners, and those subsequent owners known to defendants. Defendants therefore should have known, plaintiffs assert, that not all current owners of F–32's had been notified of the hull vent defect. Finally, plaintiffs advert to certain statements, made by Trojan's employees in internal memoranda, which they claim evince a callous and cavalier attitude toward the risks posed by the product.

The Court never has specifically evaluated the defendant's efforts to warn boat owners of potential problems with the F–32. The existence of a "defect" had been stipulated to at an earlier stage; analysis of defendant's alleged failure to warn therefore became unnecessary to the determination of liability. At this point in the case, the Court preliminarily notes that there are many respects in which the recall campaign conducted by Trojan could have been more thorough. Certainly, efforts to reach *all* subsequent boat owners, through media coverage or other like means, would have been desirable.

Trojan therefore may not have chosen the best method of warning F–32 owners; if may even have acted without due care in this regard. This does not, however, necessarily mean that its actions rose to the level of gross negligence or deliberate wrongdoing. In this regard, the Court makes the following observations. First, the evidence shows that the company received only a few complaints of water intake, spread out over several years. In response to the first complaints of water intake that Trojan received, the company responded by providing baffles designed for installation around the air vents. *See* Seidell deposition at 22–25; Lorenz deposition at 39–42. The company apparently did not determine until some time later that this was not an adequate means by which to correct the defect. The evidence also shows that in each of the incidents reported, various cruising speeds, attitudes, sea heights and other circumstances were involved; this no doubt made it difficult for the manufacturer to diagnose the condition and to recommend curative action. It is not at all clear, from the facts shown, that Trojan was able to conclude early on that a specific design defect was causing the problems that had been reported.

When Trojan did undertake to conduct the recall campaign, it did so with the coast guard's supervision and advice. The parties stipulated that the coast guard never voiced any objection to the manner in which Trojan conducted the campaign or fulfilled its reporting requirements. The scope of the direct mailing, specifically the attempt to contact all dealers, distributors, first purchasers and subsequent purchasers (if known), was in accordance with the coast guard's specific instructions; Trojan only varied from these instructions in sending the notices by first-class rather than certified mail. The campaign was terminated, at the coast guard's request, approximately one year after it had begun.

Plaintiffs are asking the Court to base a finding of malicious misconduct upon certain statements made by Trojan's representatives in internal memoranda. The

---

**10.** At the second bench trial, this stipulation was formally marked as exhibit "PD 1."

memoranda discussed the efficacy under the circumstances of a product recall; in one handwritten note, the statement was made that "[s]ooner or later our luck is going to run out." The Court finds that regardless of the individual attitude that may be betrayed by these memos, this does not negate the fact that the company did inform the coast guard of the problem, did send out letters, and did provide replacement pumps at its own cost. In light of all of the facts, the Court cannot conclude that defendant's conduct even approached the level of gross neglect or deliberate misfeasance that is required to support a punitive damage award.

## V. Prejudgment interest

Plaintiffs have requested that the Court apply prejudgment interest to its award. Interest would run from the date of the decedents' deaths. The defendants assert that the imposition of prejudgment interest would be inappropriate in this case.

Under admiralty law, many courts have held that the customary distinction between "liquidated" and "unliquidated" damage awards, for purposes of assessing prejudgment interest, is no longer applicable. See First Nat'l Bank of Chicago v. Material Serv. Corp., 597 F.2d 1110, 1120 (7th Cir.1979). Under this rationale, prejudgment interest has been imposed in cases involving Moragne-type wrongful death actions. See id.

In the Sixth Circuit, a distinction has been drawn in several cases, on this issue, between damages sought for personal injury or death, and those sought for property damage under admiralty law (the classic liquidated/unliquidated damages dichotomy). See, e.g., Oglebay Norton Co. v. CSX Corp., 788 F.2d 361, 367 (6th Cir.), cert. denied, 479 U.S. 849, 107 S.Ct. 173, 93 L.Ed.2d 109 (1986); In re United States Steel Corp., 436 F.2d 1256, 1279 (6th Cir. 1970); Cleveland Tankers, Inc. v. Tierney, 169 F.2d 622, 626 (6th Cir.1948). These cases, however, involved personal injury claims made under the Jones Act; actions under that statute are typically not within the court's admiralty jurisdiction, but are made at law. See Oglebay Norton, 788 F.2d at 367. But see United States Steel,

436 F.2d at 1276, 1279 (applying general rule against prejudgment interest in death claims to Moragne claim as well as to Jones Act claims). One court in this district has taken statements from these cases as an indication that prejudgment interest may not be awarded in this circuit on general maritime wrongful death claims. See Peterson v. Chesapeake & Ohio Ry. Co., 582 F.Supp. 1581, 1582 (W.D.Mich.1984), aff'd, 784 F.2d 732 (6th Cir.1986).

 In cases where prejudgment interest is the general rule, an assessment of interest must be made absent a special set of circumstances that would make the assessment unjust. Oglebay Norton, 788 F.2d at 368; First Nat'l Bank of Chicago, 597 F.2d at 1121. Such circumstances are to be found by the trial judge. Examples of the same are cases where the fault was mutual; or where there was persistent uncertainty surrounding liability, the extent of damage, or the apportionment of fault. First Nat'l Bank of Chicago, 597 F.2d at 1121. It is in any case erroneous for a court to apply prejudgment interest to damages intended to compensate for future injuries. Valley Line Co. v. Ryan, 771 F.2d 366, 377 (8th Cir.1985); Hillier v. Southern Towing Co., 740 F.2d 583, 585 (7th Cir.1984); Williams v. Reading & Bates Drilling Co., 750 F.2d 487, 490 (5th Cir.1985).

 In the instant case, this Court need not determine whether prejudgment interest is available as a matter of law in this type of case; it finds that the circumstances of the case militate strongly against such an assessment on the award. In particular, the Court notes the age of this case, which is not due to the actions of any one party, but to a combination of factors including the complexity of the issues, the myriad of legal questions that have been raised, and the scope of the discovery that was conducted. It also notes that crucial factual issues including causation, apportionment of fault, and the extent of damages have been zealously disputed, all the way down the line. To say that this case is one in which very close questions, both legal and factual, have been involved is a gross understatement; resolution of the issues posed here has been an extraordinari-

ly·complex process for all involved. Under these circumstances, the Court finds that an award of prejudgment interest would be patently unfair.

## VI. *Motion to intervene*

 Shortly before the second bench trial in this case, a motion to intervene was filed on behalf of the Home Insurance Company. The movant asserts that at the relevant time it was the worker's compensation carrier for Bay Haven Marina, and that in that capacity it has paid workers' compensation benefits on behalf of decedents Anderson and Brower. The insurance carrier now wishes to intervene in order to protect its right to a lien on the proceeds of this action, under Mich.Comp. Laws Ann. § 418.827.

The other parties to this action object to the proposed intervention, on various grounds. They claim that the Michigan worker's compensation statute does not apply in this case, because decedents were not acting within the scope of their employment at Bay Haven. Further, they assert that the state compensation scheme is not applicable to an accident that occurred on navigable waters.

The proposed intervenor has not stated facts showing that it is entitled to intervene in this case. Its motion is based upon the assertion, made in movant's brief and proposed complaint in intervention, that this action arose out of an injury sustained by decedents Anderson and Brower while in the course of their employment with Bay Haven Marina. The Court, however, already has specifically found that the decedents were not acting within the course of their employment at the time of their deaths. This determination is in line with Michigan law under the worker's compen-

sation act.[11] Therefore, the Court finds no basis for allowing intervention of the insurance company at this point in the action.

*Conclusion*

Based upon the foregoing discussion of facts and law, therefore, the Court orders that judgment be entered in favor of plaintiffs and against defendants in the following amounts: for the estate of Anderson, $981,246.14 (gross award of $1,226,557.67, reduced by 20% comparative negligence); for the estate of Brower, $1,301,286.08 (gross award of $1,626,607.60, reduced by 20%); for the estate of Stevenson, $24,000 ($30,000 award reduced by 20%); for the estate of Willsey, $24,000 ($30,000 award reduced by 20%). The motion to intervene filed by Home Insurance Co. is DENIED.

IT IS SO ORDERED.

---

**11.** At the time of the occurrence, as discussed in the earlier findings of this Court, decedents Brower, Anderson and Stevenson were returning to Holland from a boat show in Chicago. Travel to and attendance at the boat show arguably was a "special mission" conducted for the benefit of decedents' employer. *Cf. Bush v. Parmenter, Forsythe, Rude & Dethmers,* 413 Mich. 444, 452, 320 N.W.2d 858 (1982) (recognizing that a journey off employer's premises may fall within scope of employment, where special characteristics of the trip make it an

integral part of the employment). However, the "special mission" theory does not apply when there has been a sufficient deviation·from the mission to break the nexus between the employment and the injury. A deviation may be caused by substantial changes in the risk involved, or in the nature of the activity. *Jones v. TRW, Inc.,* 139 Mich.App. 751, 362 N.W.2d 801, 804 (1984). In this case, decedents greatly enhanced the risks involved in their "mission" by deciding to return across the lake late in the day, in a boat they were not familiar with.