791 F.2d 402
 Prod.Liab.Rep.(CCH)P 11,048
Richard Troyce ROBERTSON, Plaintiff-Appellee, Cross-Appellant,
and
Employers Ins. of Wausau, Intervenor-Appellant,
v.
SUPERIOR PMI, INC., Defendant-Appellant, Cross-Appellee-Appellee.
 No. 85-4264.
 United States Court of Appeals,
Fifth Circuit.
 June 11, 1986.
 
 John G. McLure, Howard B. Gist, III, McLure & Pickels, Alexandria, La., for defendant-appellant, cross-appellee-appellee.
 Daniel E. Broussard, Jr., Broussard, Bolton & Halcomb, Alexandria, La., for plaintiff-appellee, cross-appellant.
 Appeals from the United States District Court for the Western District of Louisiana.
 Before GOLDBERG, HILL and JONES, Circuit Judges.
 IRVING L. GOLDBERG, Circuit Judge:
 
 
 1
 The gruesome nature of accidents in the workplace never diminishes. This diversity case presents yet another tragedy. Nineteen year old Richard Robertson, an employee of Hunt Plywood Company, stood working at his station on Hunt's plywood assembly line. Not more than two feet "downstream" and to his right operated Superior PMI's automated "flying saw," whose novelty rested in its synchronization with the movement of the line and its attendant ability to clamp and then cut across the sheets of plywood as they moved along the line. Cut completed, clamp and saw returned upstream to clamp and cut exactly in the same place as before. Robertson's misfortune was to find his hand under the saw at the moment it clamped. His right hand crushed by the clamp and the four fingers severed by the undiscriminating teeth of the saw, Robertson sued Superior PMI.
 
 
 2
 In a bench trial, Robertson convinced the trial judge that the absence of a guard or some sort of device that would have prevented his hand from finding its way under the clamp rendered Superior's product defective. The trial judge also found that Robertson's conduct prior to his injury was negligent, and that his negligence contributed 35% to his injury. Applying comparative fault, the trial judge reduced Robertson's damages by 35%, and entered judgment against Superior for $520,807.22. 600 F.Supp. 790.
 
 
 3
 In his appeal, Robertson contends that the Louisiana Supreme Court's decision in Bell v. Jet Wheel Blast, 462 So.2d 166 (1985), which was decided after the district court's decision but prior to its entry of judgment, precludes the application of comparative fault in this type of products liability case. In its appeal, Superior claims that its saw was not defective. It also alleges error in the district court's refusal to find that Robertson had assumed the risk, in its refusal to consider any negligence on the part of Robertson's employer, and in its computation of damages. Concluding that the trial court was correct in everything but its decision to apply comparative fault, we modify the judgment to hold Superior liable for the full $801,241.88 in damages.
 
 FACTUAL BACKGROUND
 
 4
 On the morning of July 8, 1981, Robertson was working for Hunt on an assembly "layup" line in its plywood manufacturing plant in Pollock, Louisiana. Hunt had both designed and built the assembly line compactly so as to save money and space at its plant. Hank Clark, manager of the Pollock plant, decided to incorporate a "flying saw" into the line because the flying saw reduced waste and more fully automated the assembly line.
 
 
 5
 The movement of the assembly line and the operation of the flying saw were synchronized by a common chain drive. This synchronization allowed the flying saw's upstream and downstream movement to be stopped automatically when the conveyor line was stopped. During the saw's cutting cycle, the flying saw would travel to its farthest upstream position, clamp the panel, and then cut as the material travelled downstream on the conveyor. At its farthest downstream position, the clamp, which was also a guard for the saw blade, would rise up and travel back upstream to the starting position. At the same time, the saw blade automatically lowered to a position beneath the conveyor line and accompanied the clamp upstream. There was no need for an operator to be near the flying saw, as automatic limit switches made sure that the machine always clamped and cut at the same location on the conveyor.
 
 
 6
 Hunt had purchased the flying saw, whose only application at the time was on a plywood layup line, from Superior. Although Superior manufactured entire layup lines, Hunt never considered buying the entire line from Superior. Superior also furnished Hunt with a control panel, and Hunt completed installation of the saw and the panel. Superior assisted in the wiring and start-up of the saw, though its serviceman offered no advice concerning safety.
 
 
 7
 Hunt placed the control panel approximately two feet upstream from the saw and three to four feet behind Robertson's station. By use of these controls, Robertson could stop and start either the saw or the entire assembly line. These controls were the only ones that could completely shut down the entire line and the saw.
 
 
 8
 Foot pedals also allowed some employees to stop and start the layup line by disengaging the chain drive to the conveyor. Disengaging the chain drive also halted the cutting cycle of the flying saw. The saw blade would still continue spinning, but the travel and movement of the clamp and saw would cease. These pedals were at the "core layers' " stations. The core layers--those persons whose job it was to place material between the sheets of veneer--used the pedals to stop the line so that they could straighten the sheets of veneer and the pieces of core.
 
 
 9
 As the district court found,
 
 
 10
 Many times a sheet turner such as Robertson would yell to a core layer to hold the line. The core layer would step on the foot pedals in order to stop the layup line, so that material could be straightened at his or another worker's station. This was the standard operating procedure for the workers on the layup line at Hunt, because not all work stations had these foot pedals. The workers stopped the line by use of the foot pedals rather than the control panel because it was more convenient and kept production at a higher level. Despite the high level of noise at the plant, this procedure had been successfully followed for a significant period of time by the employees at Hunt.
 
 
 11
 Finding of Fact, Rec. at 375-76. Hunt has no written procedures regarding the straightening of materials on the line.
 
 
 12
 Robertson's responsibilities were to place the last sheet of veneer on the four by eight foot panels, check the alignment of the panel materials to prevent any jam-ups as the panels encountered the saw, and shut down the saw if any jam-ups occurred. All of this proceeded at the rate of eight panels per minute.
 
 
 13
 In the seconds prior to the accident, Robertson noticed a broken piece of core material sticking out from between the veneer on the opposite downstream corner of the material. Fearing a jam-up if the material entered the saw, Robertson yelled to Allen Hebert, who worked at the closest core layer's station eight to ten feet upstream, to stop the conveyor line. The layup line stopped. Thinking that Hebert had stopped the line for him and that all was safe, Robertson stretched across the four-foot wide sheets of veneer and core lying on the conveyor. With his right hand he then attempted to straighten the material.
 
 
 14
 The layup line had actually been stopped, however, by someone other than Hebert and for reasons other than to allow Robertson to carry out his task. When the other core layer had accomplished his purpose, he freed his foot pedal. Since Hebert had not depressed his pedal control, the conveyor line began to move.
 
 
 15
 The flying saw was in the up position, about 1 to 1 1/2 feet downstream from Robertson's right hand, when the layup line was restarted by the worker who had previously stopped the line for another reason. Robertson, who was leaning on his right hand, lost his balance so that his right hand was pinned between the layers of material. His hand was then pulled toward the flying saw by the downstream motion of the conveyor line. The flying saw moved upstream. The flying saw clamp, which holds the veneer and core for cutting and serves as a guard and shield for the saw blade, came down and clamped Robertson's hand. The flying saw made its cut exactly at the same place on the conveyor as it always did. Robertson's right hand was crushed by the clamp and his four fingers were severed by the saw blade.
 
 
 16
 Finding of Fact, Rec. at 377.
 
 
 17
 Two hours after the accident, Hunt installed a metal safety screen across the layup line and between the saw and Robertson's station. As the district court commented, "[t]his added feature makes it difficult for a worker in Robertson's position to reach under the screen and is a visible warning of the danger existing beyond the screen." Rec. at 378.
 
 DISCUSSION
 A. The Defect
 
 18
 To recover in Louisiana from a manufacturer under strict products liability theory, the plaintiff must prove:
 
 
 19
 (1) that the injury or damage resulted from the condition of the product; (2) that the condition made the product unreasonably dangerous to normal use; and (3) that the condition existed at the time the product left the control of the manufacturer or supplier.
 
 
 20
 Bell v. Jet Wheel Blast, 462 So.2d 166, 168 (La.1985).
 
 
 21
 A product may be unreasonably dangerous because of its design for any one of three reasons: (1) A reasonable person would conclude that the danger-in-fact, whether foreseeable or not, outweighs the utility of the product. This is the same danger-utility test applied in determining whether a product is unreasonably dangerous per se.... (2) Although balancing under the risk-utility test leads to the conclusion that the product is not unreasonably dangerous per se, alternative products were available to serve the same needs or desires with less risk of harm; or, (3) Although the utility of the product outweighs its danger-in-fact, there was a feasible way to design the product with less harmful consequences.... In regard to the failure to use alternative products or designs, as in the duty to warn, the standard of knowledge, skill and care is that of an expert, including the duty to test, inspect, research and experiment commensurate with the danger.
 
 
 22
 Halphen v. Johns-Manville Sales Corp., 484 So.2d 110, 115 (La.1986).
 
 
 23
 The trial court held Superior strictly liable under the third means of proving a defective product:
 
 
 24
 We conclude that this flying saw, manufactured by Superior, was defective, i.e. unreasonably dangerous, because the clamp and saw blade were not adequately guarded by a physical barrier. The cost of such a barrier would be very small and we cannot find that there would be any production problems caused by such a barrier. We do not think that the manufacture, marketing, shipping or utility of this product will be adversely affected by the production of a flying saw with such a barrier.
 
 
 25
 Rec. at 380. Although the trial court undoubtedly had in mind the screen that Hunt had installed after the accident, we note that plaintiff's expert also described a "panic release bar," which could be placed in front of the clamp. This device would trigger automatically when a worker's hand was drawn into it, thereby arresting the motion of the clamp.
 
 
 26
 Superior contends in its appeal that "the holding amounts to a requirement that Superior design a saw which was fool proof to the extent that no person could be cut by the saw, only wood. This holding," it continues, "is a clear error of law for no other court has required a manufacturer to design a fool proof or fail safe saw or other piece of machinery." Defendant-Appellant's Brief at 6. Superior would have a point, if it had characterized the district court's holding correctly.[1] Superior has, however, misread the district court's holding.
 
 
 27
 The language that Superior finds particularly egregious is the following:
 
 
 28
 We hold that a manufacturer of dangerous machinery has a duty to protect a worker stationed near that machinery, where it is reasonably foreseeable that the worker would be placed near the machinery and where it is reasonably foreseeable that the worker would suffer injury from that machinery's operation. We find that in this particular case, that duty can only be fulfilled by designing the flying saw so that a physical barrier would prevent the worker from reaching too close to the flying saw; from being pulled into the flying saw by the conveyor; or from inadvertently sticking his hand under the path of the clamp on the flying saw.
 
 
 29
 Rec. at 380 (emphasis added).
 
 
 30
 Put simply, Superior's contention is frivolous. The court did not explicitly or implicitly require that Superior "construct a barrier which would allow only wood to enter the saw and not human tissue." Defendant-Appellant's Brief at 8. Rather, the court required that, in order to avoid liability under Louisiana products liability doctrine, Superior install a barrier that would reduce significantly--not absolutely--the danger that human hands will be clamped under the saw. The adequacy of any particular barrier is a question best left to another case.[2] Given, however, that Superior's flying saw contained no barrier whatsoever between the worker and the clamp, we find the district court's conclusion that the flying saw was "unreasonably dangerous in normal use" eminently sound and in accord with Louisiana law.
 
 B. Comparative Fault
 
 31
 The principal question in this case is whether Robertson's fault should be applied to reduce proportionately Superior's strict liability for the accident caused by its defective saw. In Bell v. Jet Wheel Blast, the Louisiana Supreme Court decided that "pure comparative fault principles would seem to coincide with and further the goals of products liability doctrine in some cases." 462 So.2d at 171. The Court then set out the following broad rule to guide courts in the application of comparative fault:
 
 
 32
 Where the threat of a reduction in recovery will provide consumers with an incentive to use a product carefully, without exacting an inordinate sacrifice of other interests, comparative principles should be applied for the sake of accident prevention. The recovery of a plaintiff who has been injured by a defective product should not be reduced, however, in those types of cases in which [the reduction] does not serve realistically to promote careful product use or where it drastically reduces the manufacturer's incentive to make a safer product.
 
 
 33
 Id. at 171-72 (emphasis added). The rule therefore seems to be that a court will introduce comparative fault to reduce a strict liability judgment when the consequent reduction of the award will realistically promote user care without "drastically reducing" the manufacturer's incentive to make a safer product.
 
 
 34
 Applying this rule, the Court concluded that the application of comparative fault to the facts in Bell would be inappropriate:
 
 
 35
 The plaintiff was injured while performing a repetitive operation with a defective industrial machine as required by his employer. His hand got caught in the chain and sprocket drive of the conveyor system of the machine because of the lack of an adequate guard at the particular place on the drive that the injury occurred. His ordinary contributory negligence in combination with the machine's defect caused the accident and injury. Under these circumstances, the application of comparative fault would not serve to provide any greater incentive to an employee to guard against momentary neglect or inattention so as to prevent his hand from being mangled by machinery. Reduction of the plaintiff's award in this type of case would only tend to defeat the basic goals of strict products liability doctrine by reducing economic incentive for product quality control and by forcing the injured individual to underwrite a loss himself which could be more efficiently distributed by the manufacturer through insurance and price adjustments. Cf. Suter v. San Angelo Foundry and Machine Co., 81 N.J. 150, 406 A.2d 140 (1979) ("The imposition of a duty on the manufacturer to make the machine safe to operate whether by installing a guard or ... by making it inoperable without a guard, means that the law does not accept the employee's ability to take care of himself as an adequate safeguard of interests which society seeks to protect." 406 A.2d at 148); Bexiga v. Havir Manufacturing Corp., 60 N.J. 402, 290 A.2d 281 (1972) ("The asserted negligence of plaintiff ... was the very eventuality the safety devices were designed to guard against." 290 A.2d at 286).
 
 
 36
 Id. at 172 (footnote omitted).
 
 
 37
 Without the benefit of Bell, the district court concluded that comparative fault would apply in products liability actions. It then found Robertson negligent:
 
 
 38
 Robertson owed himself a duty of reasonable care in the performance of his work. We find that he failed to use reasonable care in that he failed to use the control panel to shut down the flying saw and the plywood layup line when attempting to straighten the material on the line. In addition, Robertson failed to use reasonable care in that he failed to observe and be aware of the placement of his right hand in relation to where the flying saw would make its cut.
 
 
 39
 Rec. at 382. The trial court also found that Robertson's negligence contributed 35% to his injury and reduced his recovery accordingly. With the benefit of Bell, however, we conclude that the Louisiana Supreme Court would proscribe the application of comparative fault in this case.
 
 
 40
 We would be hard pressed to describe a case that more closely reflects Bell's concern for the realities of employee safety.[3] Robertson's employer required him to stand within two feet of an unreasonably dangerous machine for the length of his shift, day in and day out. Plaintiff's expert at trial testified that safety studies since 1900 have recognized that the monotony and routine of an employee's tasks breed a complacency in the employee, who will then tend to ignore danger areas simply because she has previously avoided injury. Rec. at 292. This reality clearly drove the Bell court's decision that "the law does not accept the employee's ability to take care of himself as an adequate safeguard of interests which society seeks to protect." 462 So.2d at 171. For this reason, Robertson's "failure to use reasonable care" in the placement of his hand at his work station cannot be brought under the rubric of comparative fault.
 
 
 41
 Robertson's failure to use the control panel to shut down the saw completely and his decision to rely on his fellow employee's foot pedal instead present a slightly different problem. Plaintiff's own expert testified that it was "imprudent under any condition that is extremely dangerous, under a condition such as this," to have relied on someone else to stop the line. Rec. at 278. However, in light of the trial court's finding that reliance on other operators to stop the line was standard operating procedure in just such a situation as Robertson confronted, his failure to use a safer alternative does not trigger the application of comparative fault.
 
 
 42
 Larry Manthie, Hunt's plant superintendent, testified that it rested within Robertson's discretion whether or not to use the control panel to shut down the line when a veneer panel required straightening. Only when a jam-up actually occurred was Robertson instructed to use the control panel to shut down the saw. Tr. at 329-30. The conclusion is inescapable that, under pressure to keep production at the highest possible levels and without instructions from his employer to forgo the riskier alternative, Robertson realistically had no incentive to use the control panel, particularly since his reliance on his fellow operators had never been misplaced.
 
 
 43
 Moreover, Bell 's use of Suter v. San Angelo Foundry and Machine Co., 81 N.J. 150, 406 A.2d 140 (1979), convinces us that the Louisiana Supreme Court, were it to face this issue squarely, would not apply comparative fault. Suter involved an accident in which the plaintiff, while extracting a piece of slag from a sheet metal rolling machine, inadvertently brushed against the machine's gear lever, pushing it out of its neutral position and activating the rollers, which caught and pulled his fingers through. Rather than shut the motor off completely by using either the control panel or the foot treadle, Suter, like Robertson in a comparable situation, had chosen to leave the motor running and the machine in neutral. The New Jersey Supreme Court held that "the law does not accept the employee's ability to take care of himself as an adequate safeguard of interests which society seeks to protect," despite the fact that
 
 
 44
 Suter purchased the machine for his company, had operated it "probably a thousand times" over an eight-year period and was completely conversant with every aspect of the equipment. He knew that he could deactivate the machine either by stepping on the treadle at his feet or pushing the stop button. He knew that pushing or moving the lever would activate the rollers. Suter was in charge of the operation at the time of the accident.
 
 
 45
 Id. 406 A.2d at 147.
 
 
 46
 We find, therefore, that on the fully developed record before us, Bell precludes the application of comparative fault in this case because a reduction in this employee's recovery would "not serve realistically to promote careful product use." Bell, 462 So.2d at 172.[4]
 
 C. Employer Negligence
 
 47
 Under the Workers' Compensation system, Robertson received benefits from his employer without regard to either his or his employer's fault. In return, his employer received relief from suit. Such is the legislative compromise. See Franklin v. Oilfield Heavy-Haulers, 478 So.2d 549, 556-57 (La.App. 3d Cir.1985). Under LSA-R.S. 23:1101, the employee may nonetheless maintain an action against liable third parties in addition to his compensation claim against his employer.
 
 
 48
 The rule in Louisiana has always been that the negligence of the employer does not bar its insurance company's right to recover from a liable third party the amount of benefits the employer paid out to the injured employee. Vidrine v. Michigan Millers Mutual Insurance Co., 263 La. 300, 268 So.2d 233 (1972); LeJeune v. Highlands Insurance Company, 287 So.2d 531 (La.App. 3d Cir.1973), writ ref'd, 290 So.2d 903 (La.1974). In 1985, the Louisiana legislature amended LSA-R.S. 23:1101 to provide that "where the recovery of the employee is decreased as a result of comparative negligence, the recovery of the person who has paid compensation or has become obligated to pay compensation shall be reduced by the same percentage." La. Acts 1985, No. 931 (quoted in Franklin, 478 So.2d at 557). The legislature did not, however, amend the Workers' Compensation statute to provide that the recovery of the person who has paid compensation shall be reduced in proportion to the employer's negligence.
 
 
 49
 Superior argues that the trial court should have assigned a percentage of fault to the employer-intervenor, Employers Insurance of Wausau, to reduce its recovery.[5] Superior claims that the legislature's 1979 resuscitation of the concept of comparative negligence in art. 2323 supports its position. We are unpersuaded.[6]
 
 
 50
 First, the language of art. 2323 itself, which reads as follows, does not support its position:
 
 
 51
 When contributory negligence is applicable to a claim for damages, its effects shall be as follows: if a person suffers injury, death or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the claim for damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death or loss.
 
 
 52
 La.Civ.Code Ann. art. 2323 (West 1986 Supp.) (emphasis added). As contributory negligence has never been applicable to an employer's claim for reimbursement, art. 2323 does not trigger the application of comparative fault.
 
 
 53
 Second, any inequities now present in the employer's ability to escape the application of comparative fault were present to an even greater degree in the era of contributory negligence. Franklin, supra ("The inequities of which these defendants complain have existed for years").
 
 
 54
 Third, we are persuaded, as was the appellate court in Franklin, that
 
 
 55
 any adjustment in the apportionment of the loss is a policy matter, just as the change from contributory negligence to comparative negligence was a policy matter. Therefore, [in Louisiana's code system] it is primarily a matter for legislative consideration.
 
 
 56
 Id. at 557. All three reasons counsel against accepting Superior's contention, and we therefore reject it.
 
 D. Damages
 
 57
 Superior challenges as excessive the district court's award to Robertson of $260,723 for loss of future earnings.[7] It argues: "Surely one year's loss of wages at $5.35 per hour is not equivalent to over a quarter of a million dollars!" Defendant-Appellant's Brief at 13. Obviously. And two years loss of wages at $5.35 per hour does not amount to a quarter of a million dollars either. The point that Superior has inexplicably missed is that Robertson will suffer a 65% disability of his right hand for the remaining 37 years of his expected work life. Robertson's unrebutted expert evidence at trial showed that the present value of his lost future earnings was $444,065, assuming a total disability, and $251,613, assuming a partial disability. These calculations used an eight percent discount rate, assumed a six percent annual increase in wages, and used $9,110 to indicate the difference between his annual earnings with and without his disability. There is nothing in the record to rebut any of these figures. The district court's conclusion is unassailable.
 
 CONCLUSION
 
 58
 As our society moves with cyclonic speed ever onward in the mechanization of industrial processes, legislatures and courts have wisely fashioned new concepts of liability on the part of the designers, the producers, and the users of mechanical equipment. Abandoning the common law rigors of the law of the workshop, they have discovered comparative negligence, various theories of products liability, and liability without fault. All are civilized answers to the intricacies of modern industrial relationships.
 
 
 59
 The plaintiff in this case was severely injured, and his future career prospects drastically diminished, by a machine whose defect was readily identifiable and easily remediable. In an effort to do no more than any employer expects of its employees--to be as productive as possible--the worker lost sight of his own safety. Whatever can be said of his failure to protect himself in this instance, it cannot be said that Robertson's failure triggers the application of comparative fault. The judgment of the district court is therefore modified to the full $801,241.88 and, as modified, affirmed.
 
 
 60
 JUDGMENT MODIFIED and, as modified, AFFIRMED.
 
 
 
 [1]
 In Hagan v. EZ Manufacturing Co., 674 F.2d 1047, 1048 (5th Cir.1982), this court held that, "as a matter of law, the doctrine of products liability does not require a manufacturer to build a failsafe product." We reasoned that "unless civilization is to grind to a halt, these tools [of the construction industry], including industrial table saws, must continue to be marketed despite their inherent dangers. Clearly, therefore, defendant's product is not unreasonably dangerous per se." Id. at 1052 (quoting Hagans v. Oliver Machinery Co., 576 F.2d 97, 101 (5th Cir.1978). Although the evidence in Hagans suggested that the design of the saw "was inadequate to prevent all accidents, such evidence fails to dictate a finding that the design was 'unreasonably dangerous.' " Id
 
 
 [2]
 The Court in Hagans v. Oliver Machinery Co. found that the attachment of the plaintiff's recommended blade guard "would seriously impair the usefulness of defendant's product." 576 F.2d at 101. Unlike the guard in Hagans, which would have required the manufacturer "to destroy the utility of his product in order to make it safe," id., the barrier required by the court in this case would not have diminished the flying saw's utility appreciably, if at all
 
 
 [3]
 The facts of this case are almost identical to those in Bell. One need only substitute one machine for the other:
 The plaintiff was injured while performing a repetitive operation with a defective industrial machine as required by his employer. His hand got caught in the [saw] because of the lack of an adequate guard at the particular place on the [saw] that the injury occurred. His ordinary negligence in combination with the machine's defect caused the accident and the injury. Under these circumstances, the application of comparative fault would not serve to provide any greater incentive to an employee to guard against momentary neglect or inattention so as to prevent his hand from being mangled by machinery.
 
 
 [462]
 So.2d at 172 (emphasis added)
 
 
 [4]
 Discussion of Superior's claim that it is entitled to the defense of "assumption of the risk" requires only this brief footnote. We need not decide whether the defense of assumption of the risk as a complete bar to recovery survived Bell to conclude that, in whatever form, it is unavailing here. In Prestenbach v. Sentry, 340 So.2d 1331, 1335 (La.1977), the court stated that "for purposes of a knowing assumption of a risk we impute knowledge to a plaintiff, not because he was in a position to make certain observations, but only when he actually makes those observations and, from them, should reasonably have known that a risk was involved." Robertson had no reason to think that someone other than Hebert had stopped the line. Consequently, he did not know that the line might restart prior to the completion of his task. The court's finding that Superior failed to prove the facts necessary for a showing of assumption of risk is therefore not clearly erroneous
 
 
 [5]
 Superior apparently would apply this percentage against the compensation benefits paid under the statute, rather than against the damage award itself
 
 
 [6]
 Although the district court made no explicit findings as to Hunt's negligence, the conclusion appears unavoidable that Hunt negligently placed Robertson too close to the flying saw
 
 
 [7]
 Judge Jones expresses the following concern:
 In awarding damages, the trial court assessed $400,000 for Robertson's claims for disfigurement, pain and suffering, past and future, permanent disability, mental anguish and embarrassment. For reasons unknown to me, the defendant chose not to appeal this high award for general damages.