Charles Anthony CATES and Donna Gwynn Cates, Individually and as Administrator to the Estate of Their Minor Child, Seth Cates, Plaintiffs–Appellants, Cross–Appellees,

v.

SEARS, ROEBUCK & CO. and Emerson Electric Co., Defendants–Appellees, Cross–Appellants.

Nos. 89–4879, 90–4181.

United States Court of Appeals, Fifth Circuit.

April 1, 1991.

---

Lawrence W. Pettiette, Jr., J. Jay Caraway, Blanchard, Walker, O'Quin & Tobers, Shreveport, La., for plaintiffs-appellants, cross-appellees.

Paul V. Cassisa, Sr., Carl J. Griffin, Jr., Bernard, Cassisa, Saporita & Elliott, Metairie, La., for defendants-appellees, cross-appellants.

Before POLITZ, WILLIAMS, and SMITH, Circuit Judges.

POLITZ, Circuit Judge:

Injured while using a power saw built by Emerson Electric Company and marketed as its own by Sears, Roebuck & Co. (hereafter collectively referred to as "Sears"), Charles Anthony Cates, joined by his wife,[1] filed suit seeking a refund of the purchase price in a redhibitory action and damages for a products liability claim. The jury awarded a refund of the purchase price and damages in the *ex delicto* claim reduced by 85% for Cates' comparative negligence. The district court awarded attorney's fees for services in connection with the action in redhibition. Dissatisfaction abounded; both sides appealed. We consolidated the appeals. Cates seeks reversal of the comparative negligence reduction, an increase in the attorney's fee award, and the grant of expert witness fees. Sears seeks a total reversal of the adverse judgment. For the reasons assigned we affirm the judgments entered by the district court.

*Background*

On December 1, 1984 Cates purchased a 10–inch 2.5 horsepower Craftsman radial arm saw at a Sears store in Shreveport,

1. Hereafter referred to singularly for ease of reference.

Louisiana. The saw, manufactured by Emerson in February 1984, was installed in Cates' home workshop in Stonewall, Louisiana, where he used it on wood craft projects.[2]

On December 5, 1986 Cates was injured while using the saw; three fingers of his right dominant hand were completely severed and another was severely lacerated.

The parties differ in their explanations of the accident. Cates attests that the saw did a "kickback"[3] while he was standing behind it feeding the lumber from the "out rip"[4] position. Sears offered evidence that Cates' injuries probably were caused by a "wrongway feed" of the lumber.[5]

Cates filed suit in state court; Sears removed based on diversity jurisdiction. Subsequent to removal Emerson was added as a party-defendant. We sit as an *Erie* court.[6]

The factual dispute essentially revolves around the "antikickback" device installed on the saw. This device consists of a circular spreader designed to keep the cut in the wood open and small metal pawls to grip the wood. Cates claims that a blade guard should have been installed to provide protection for the user's hands, especially during an out rip. The record contains evidence of two other radial arm saws which had blade guards. In fact, an earlier model of the Emerson saw had such a guard which was removed from later models. The record contains no explanation for that removal.

Cates attempted to offer evidence that Emerson had changed the warning placard and text of the owner's manual about three

months prior to his purchase, reflecting its awareness of the danger of the very accident he had experienced. Emerson successfully moved *in limine* for suppression of this evidence. Further, the district court disallowed Cates' effort to offer rebuttal evidence about the probability or improbability of a wrongway feed.

The jury found the saw defective; set damages at $184,273.05; found Cates 85% at fault in the accident; and reduced his damages accordingly to $27,640.95. Reimbursement of the purchase price of $349.99 was granted.

Based on the successful redhibition action, the court awarded attorney's fees of $29,000; Cates sought fees in excess of $112,000. Expert witness fees were disallowed.

### Analysis

#### 1. *Comparative fault*

■ We first address Cates' contention that the trial court erred by applying the comparative fault concept to his claims. He argues that Louisiana jurisprudence, and consideration of the factor that reducing recovery because of Cates' negligence would serve to reduce the incentive of manufacturers to produce a safe product, both militate in his favor. Alternatively, he proposes that the court set an absolute ceiling of 25% fault attributable to Cates. This latter contention is addressed to the wrong forum—this is fit grist for the Louisiana legislative mill, not that of an *Erie* court seeking to apply existing state law.

---

2. For matters relevant to this litigation Sears, the seller, has the same responsibility as the manufacturer and is presumed to know the defect in the Emerson-manufactured Craftsman saw. *Chappuis v. Sears,* 358 So.2d 926, 930 (La.1978); *Rowell v. Carter Mobile,* 500 So.2d 748 (La.1987); *Molett v. Penrod Drilling Co.,* 826 F.2d 1419 (5th Cir.1987); *Brooks v. Vitek,* 875 F.2d 499 (5th Cir.1989).

3. "Kickback" is defined as an uncontrolled grabbing and throwing of the workpiece back toward the operator during a ripping cut. "Ripping cuts" are defined as any cut into the wood with the grain (distinguished from "crosscuts" which cut across the grain of the wood).

4. "Out rip" is defined as the positioning of the blade of the saw parallel to the workpiece with the motor towards the rear of the saw. The "in rip" position has the blade parallel to the workpiece with the motor towards the front of the saw.

5. To "wrongway feed" is to direct the wood into the "outfeed" side of the saw rather than against the direction of the blade's rotation.

6. *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

■ In this diversity action involving a saw purchased and used in Louisiana, where the accident occurred, we apply Louisiana substantive law. The Louisiana Supreme Court, responding to a question we certified,[7] discussed in depth the issue of a manufacturer's liability for its product in *Halphen v. Johns–Manville Sales Corporation,* 484 So.2d 110 (La.1986). The *Halphen* court outlined the categories of products liability cases then existing,[8] noting that an essential element in each category was "proof that the defendant's product was unreasonably dangerous to normal use." *Id.* at 113. Halphen did not alter the requirement that the offending condition must exist at the time the product leaves the manufacturer's control. *E.g., Bernstine v. Textron, Inc.,* 546 So.2d 614 (La.1989).

The *Halphen* court noted that products could be unreasonably dangerous: (1) *per se,* (2) in design, (3) in construction or composition, and (4) for failure to warn about a danger. The design category in turn has three subsets: (1) unreasonably dangerous *per se,* (2) readily replaceable by a safer alternative, and (3) feasibly subject to design with less harmful consequences. The second and third require proof that the manufacturer knew or could have known of and reasonably avoided the dangerous condition.

Cates contended at trial that the saw had design defects and the antikickback device was so constituted as to be more dangerous than intended. The first design defect focused on the probability of injury from an unguarded blade outweighing the social utility factor. The second was based on the feasibility of a safer alternative design, one with a blade guard. In addition Cates complained of the placement of the antikickback device and of insufficient warnings.

Sears responded that the saw was not unreasonably dangerous and, alternatively, if it were, the accident was caused by Cates' negligent use and not by any latent danger. The issue of comparative negligence was presented squarely to the district court and was extensively briefed *in limine.*

■ Whether to apply comparative fault is a question of law, freely reviewable on appeal. *Robertson v. Superior PMI, Inc.,* 791 F.2d 402 (5th Cir.1986). The Louisiana Supreme Court provided guidance in *Bell v. Jet Wheel Blast,* 462 So.2d 166 (La.1985),[9] which we discussed at length in *Robertson.* In *Robertson* we noted that the *Bell* rule "therefore seems to be that a court will introduce comparative fault to reduce a strict liability judgment when the consequent reduction of the award will *realistically* promote user care without '*drastically* reducing' the manufacturer's incentive to make a safer product." *Robertson,* 791 F.2d at 407 (emphasis original).

Both parties and the trial court put special emphasis on whether Cates' actions constituted a repetitive operation as existed in *Bell.* While repetitive actions, and the monotony and routine of the assembly line may "breed a complacency in the employee, who will then tend to ignore danger areas because she has previously avoided injury," *Robertson,* 791 F.2d at 408, it is error to assume that *Bell* gives repetitive motion a talismanic effect in the comparative fault determination. The instant case does not involve an assembly line and the dangers of the subject home workshop saw may not be directly analogous. Nonetheless, *Bell* guides our analysis which we conclude should be on a flexible case-by-case basis and not pursuant to a rigid checklist. For as the Louisiana Supreme Court informed:

> Our decision is intended as an answer to the certified question and as a first

---

7. *Halphen v. Johns–Manville Sales Corp.,* 755 F.2d 393 (5th Cir.1983) (en banc).

8. Since the *Halphen* decision, a comprehensive change of Louisiana products liability law has occurred. *See* Louisiana Products Liability Act, La.R.S. 9:2800.51 *et seq.* The new law has no effect on cases, like that of Cates, arising prior

to September 1, 1988. *Traut v. Uniroyal, Inc.,* 555 So.2d 655 (La.1989); *McCoy v. Otis Elevator,* 546 So.2d 229 (La.App.1989).

9. *Bell* also was in response to a question certified by this court. *See Bell v. Jet Wheel Blast,* 717 F.2d 181 (5th Cir.1983).

step in the formulation of a just and socially useful rule, not as an answer to all questions that may be expected to arise. For example, the question of whether other classes of cases fall within the category to which comparative fault may apply must be decided on a case-by-case basis. Pending future judicial or legislative developments, we are content for the present to assume the position taken by the California court which scrupulously abstained from issuing a detailed guidebook to the new area of comparative negligence, preferring to adopt the view " 'that ... the trial judges of this State are capable of applying [a] comparative negligence rule without our setting guidelines in anticipation of expected problems. The problems are more appropriately resolved at the trial level in a practical manner instead of a theoretical solution at appellate level. The trial judges are granted broad discretion in adopting such procedure as may accomplish the objectives and purposes expressed in this opinion.' "

*Bell,* 462 So.2d at 172–73 (abridgement original) (quoting *Daly v. General Motors Corp.,* 20 Cal.3d 725, 741–43, 144 Cal.Rptr. 380, 390, 575 P.2d 1162, 1172 (1978)). The question thus remains one of law, but it is one inextricably tied to specific factual findings which implicates the customary deference on review.

We perceive no basis for rejecting the trial court's studied decision to apply comparative fault principles to the situation at bar. The court aptly noted in a pretrial order, "This result will not drastically reduce the manufacturer's incentive to make such saws safer. It would, however, encourage operators of such saws to use them with care." *Cf. Nicholas v. Homelite Corporation,* 780 F.2d 1150 (5th Cir.1986) (same finding led to application of comparative fault in a personal-use chain saw case).

■ Louisiana strict products liability law appears to pursue four primary goals: (1) reduction of total costs of accidents by deterring accident-causing activity; (2) lowering societal cost by spreading the loss among large numbers; (3) reducing the cost of administering cases; and (4) achieving these ends in a manner consistent with justice. *Halphen,* 484 So.2d at 118. We conventionally speak of normatively encouraging appropriate responses by manufacturers, expecting them to produce ever-safer products as a linear result of large adverse judgments, *cf.* M. Shapo, *The Law of Products Liability* § 7.05[5] (1987); *but cf. Grenada Steel Indus. v. Alabama Oxygen Co.,* 695 F.2d 883, 887–88 (5th Cir.1983) ("*A priori* judgments concerning why manufacturers do or do not alter their products, made by such dubious experts as judges, lawyers, and law professors, suffer from excessive reliance on logical deduction and surmise without the benefit of evidence of industry practice or economic factors."), but in order to truly deter accidents we must also, as the jury apparently did, place blame where it is due.

The jury found Cates largely at fault for the accident. There was ample evidence of his familiarity with the saw's use and its inherent dangers. When a court applies the comparative fault doctrine in a given situation it encourages or discourages future behavior involving similar risks. The instant verdict necessarily impacts on future users of woodworking equipment. Cates' contention that the application of the doctrine will remove the incentive for production of a safe or safer saw misperceives a significant point we noted in *Nicholas*:

> Comparative fault does not alter the manufacturer's duty to produce safe wares because it does not alter the manufacturer's liability. Comparative fault provides an episodic post-manufacture reduction in the final economic assessment against the manufacturer based on the user's actions, without regard to the prior actions and responsibilities of the manufacturer. No reasonable manufacturer can rely on future careless use of its products to offset its full liability with any predictability that would alter the manufacturer's duty to produce the safest product possible.

780 F.2d at 1153. The trial court did not err in applying the comparative fault rubric

in the instant case.[10]

## 2. *Causation*

█ Sears vigorously asserts that the trial cout erred by declining to grant a directed verdict on causation, maintaining that Cates offered insufficient evidence to support his theory of how the accident occurred and, regardless, the evidence it offered was more credible. We are not persuaded.

█ A motion for directed verdict should be granted only where the evidence, considered in the light most favorable to the nonmoving party, is such that reasonable persons could arrive only at a verdict in favor of the movant. *Webb v. Rodgers Machinery Mfg. Co.*, 750 F.2d 368 (5th Cir.1985). This standard sets an extremely high threshold and such motions "have a high mortality rate in this circuit." *Hagans v. EZ Mfg. Co.*, 674 F.2d 1047, 1050 (5th Cir.1982).

The trial court denied the motion for directed verdict on the basis of uncontroverted evidence that Cates' injuries occurred on the unguarded portion of the sawblade and on an expert's testimony that there was a "safer and better way to guard the back side of the saw." That expert was a mechanical engineer with substantial design experience with Emerson and other leading saw manufacturers. The trial court further noted that the jury had before it evidence of older saws which evidenced the feasibility and practicality of alternative blade guards which made for a safer saw. The issue was for the jury. The jury obviously gave substantial credence to Sears' causation evidence as witness its assignment of 85% of the fault to Cates. The trial court did not err in denying Sears' motions for directed verdict.

## 3. *Rebuttal evidence*

█ Cates contends that the trial court erred in denying his proffer of testimony by the expert witness who had testified during Cates' case-in-chief which would have rebutted Sears' contention that a wrongway feed had occurred. Sears maintains that what Cates styles as rebuttal was merely revisiting evidence earlier presented. Whether to allow evidence in rebuttal is a matter within the trial court's discretion, reviewable only for an abuse. *Orduna S.A. v. Zen–Noh Grain Corp.*, 913 F.2d 1149 (5th Cir.1990). We perceive no abuse of discretion. The proffer reflects a more detailed and comprehensive explanation of earlier testimony about the kickback phenomenon. Despite an opportunity, the matter was not then pursued as it properly might have been. Rebuttal must be kept in perspective; it is not to be used as a continuation of the case-in-chief. The call by the district court, as here, frequently is a very close one. That we might have allowed this evidence were we the *nisi prius* court is not the question. We are not prepared to categorize the exclusion of this evidence as an abuse of the trial court's necessarily broad discretion in matters evidentiary.

## 4. *Subsequent remedial measures*

█ Cates contends that the trial court erred in excluding as subsequent remedial measures evidence of changes to the warning placard and the instruction manual, pointing to several instances during Sears' opening statement and during its examination of witnesses where it relied on the changed versions.

The saw was manufactured in February 1984. In September 1984 Emerson replaced the warning placard on the saw to include the statement: "DANGER AT OUTFEED. Workpiece can suddenly kickback and pull hands into and under cutting

---

**10.** Cates also maintains that the trial court erred in its comparative fault instruction. His contention, in essence an alternative attack on the application of comparative fault principles to the instant case, is that the jury was erroneously denied an opportunity to balance the extent to which the manufacturer's obligation to produce a safe saw would be affected by a reduction in Cates' recovery. Once the court properly ruled that this result would not drastically reduce the manufacturer's incentive to make such saws safer, but would encourage operators of such saws to use them with care, the district court effectively rejected this argument. The instruction was closely tailored to the pattern jury instructions for this circuit.

tool." The saw was sold to Cates in December 1984 bearing the warning "DANGER TO AVOID INJURY DO NOT FEED MATERIAL INTO CUTTING TOOL FROM THIS END." The warning placard was released for production in January 1985. The accident occurred in December 1986. The revisions to the warning manual were of 1989 vintage.

The trial court ruled that the warnings were inadmissible under Fed.R.Evid. 407.[11] In its order the district court noted our holding in *Grenada Steel Industries v. Alabama Oxygen Co.*, 695 F.2d 883 (5th Cir.1983), as support for the proposition that "the real question is whether the product or its design was defective at the time the product was sold." Further, the court indicated that our holding mandated application of the Rule 403 comparison between probative value and prejudicial effect.

Neither *Grenada Steel* nor Rule 407 have any bearing on the facts at bar. In *Grenada Steel* the issue before the court was whether Rule 407 excluded evidence that several years *after* a 1977 accident, competing manufacturers of an acetylene gas cylinder valve designed and produced a safer valve which the defendant manufacturer eventually adopted. In that *design* context we determined that such evidence was inadmissible. In the instant case, the issue of the warning placard and the revised manual goes to warnings which were changed by the involved manufacturer after the sale but *prior* to the accident. The "event" to which Rule 407 speaks is the accident, not the sale. *Rozier v. Ford Motor Co.*, 573 F.2d 1332 (5th Cir.1978); *cf.* 23 C. Wright & K. Graham, *Federal Practice and Procedure* § 5283 (1980 & Supp.1990). While the focus of a product liability case is on the dangers inherent in the product as it leaves the manufacturer, the relevant time under Rule 407 is the accident.

*Grenada Steel* answered the threshold question whether Rule 407 applied in prod-

uct liability cases, doing so based on the rationale behind the subsequent remedial measures rule, and the critical issue before the jury in a products case. "The real question is whether the product or its design was defective at the time the product was sold. The jury's attention should be directed to whether the product was reasonably safe at the time it was manufactured." *Id.* at 888 (citation omitted).

Sears stands this language on its head and curiously pontificates: "There can be no dispute in the instant case that the warnings sought to be introduced before the jury, were not on the product, or in the owner's manual, prior to the date of sale to Mr. Cates." We have before us a warnings case in which there is uncontroverted evidence that Emerson had approved a change in the warning *prior* to the sale to Cates. Further, the implementation of that change, unrelated to the Rule 407 event (which would not occur for nearly two years), occurred after the sale. Were there credible evidence that the changed warning would have had a material impact on whether the accident would have occurred, Sears' statement would be a virtual judicial admission of liability.

We conclude that the trial court's ruling on the warning placard was in error but we do not view the error as having affected Cates' substantial rights. Fed.R. Evid. 103(a). There is substantial evidence that the accident was not caused by inadequate warnings. For example, Cates was aware of and consciously disregarded several of the advisories on the warning placard.

The same result obtains as to the change in the manual. The impeachment provision of Fed.R.Evid. 407 should have sufficed for admissibility. An equally sufficient basis should have been Sears' inappropriate use of the revised placard language and the subsequently issued manual. Nonetheless,

---

11. Fed.R.Evid. 407 states:
   When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in con-

nection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

we find insufficient prejudice warranting reversal for this trial court error.

### 5. Redhibition

Both parties assert error with respect to the ruling on redhibition. Sears maintains that there was no redhibitory vice. Cates argues that the trial court erred in not awarding witness fees in addition to attorney's fees, contending that these fees would have been recoverable in state court, where this suit was initially brought, and that to deny same violates the precepts of the *Erie* doctrine.

Sears' position is based on an incorrect and untenable structuring of the action in redhibition. Sears points to evidence that Cates had used the saw extensively prior to the accident and continued to use it subsequently, arguing that *ipso facto* its product cannot be redhibitorily defective. Redhibition, as reflected by all sources including the seminal source—the specific language of the Civil Code article—encompasses more than mere worthlessness of a defective product. Article 2520 of the Louisiana Civil Code prescribes:

> *Redhibition* is the avoidance of a sale on account of some vice or defect in the thing sold, which renders it either absolutely useless, or its use so inconvenient and imperfect, that it must be supposed that the buyer would not have purchased it, had he known of the vice.

The supposition that the buyer would not have purchased the thing had he known of the vice comprises the "basic test of whether a defect is a redhibitory one." *Perrin v. Read Imports, Inc.*, 359 So.2d 738, 740 (La.App.1978); *Frank L. Beier Radio, Inc. v. Brown*, 453 So.2d 656 (La.App.1984); *Delhomme Indus. v. Houston Beechcraft, Inc.*, 669 F.2d 1049 (5th Cir.1982). This inquiry does not deem dispositive the issue of whether the thing was usable for any purpose, or whether it has any value to the purchaser. *Purvis v. Statewide Trailer Sales*, 339 So.2d 403, 407 (La.App.1976) ("Where a buyer does not intend to relinquish his right of rescission but makes such use of the object as is practical or which the circumstances require, continued use does not constitute waiver of the right of rescission."). A more important inquiry than whether the item is still minimally usable is whether the purchaser is in a position to return the purchased item. *Stratton–Baldwin Co. v. Brown*, 343 So.2d 292 (La.App.1977). In the case at bar, there was ample evidence of a defect in the saw design, and that had Cates known of the defect, he would not have purchased this model. Sears' protestation that Cates' testimony was self-serving is an argument for the trier-of-fact. That the saw is still usable solely as a cross-cutting tool does not negate Cates' redhibition claim.

Cates' contention that the *Erie* doctrine mandates award of attorney's fees in a redhibition case presents a more difficult question. *Erie* requires that federal courts apply substantive state law when adjudicating diversity-jurisdiction claims, but in doing so apply federal procedural law to the proceedings. *Hanna v. Plumer*, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965). "Whether a particular provision is substantive or procedural for *Erie* purposes is determined by looking to the 'twin aims' of the *Erie* doctrine: the discouragement of forum shopping and the avoidance of the inequitable administration of the laws." *Herbert v. Wal–Mart Stores*, 911 F.2d 1044, 1047 (5th Cir.1990) (citing *Hanna*).

We first address the question of appropriate expert witness fees.[12] There is

---

**12.** The issue of expert witness fees in federal question jurisdiction cases is well settled in this circuit. In *International Woodworkers of America v. Champion International Corp.*, we held that "fees of non-court-appointed expert witnesses are taxable by federal courts in non-diversity cases only in the amount specified by § 1821, except that fees in excess of that amount may be taxed when expressly authorized by Congress, or when one of the three narrow equitable ex-

ceptions recognized by *Alyeska [Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975) ] applies." 790 F.2d 1174, 1181 (5th Cir.1986) (en banc), *aff'd* 482 U.S. 437, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987). *International Woodworkers* and its companion case on appeal to the Supreme Court, *J.T. Gibbons, Inc. v. Crawford Fitting Co.*, 790 F.2d 1193 (5th Cir.1986) (en banc), *aff'd* 482 U.S. 437, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987), both dealt

688

a clear distinction between the applicable federal and state provisions regarding witness fees. Fed.R.Civ.P. 54(d) mandates that "Except when express provision therefor is made either in a statute of the United States or in these rules, costs shall be allowed as of course to the prevailing party unless the court otherwise directs; but costs against the United States, its officers, and agencies shall be imposed only to the extent permitted by law." The relevant statute in the matter of witness fees is 28 U.S.C. § 1821(b), which entitles witnesses to a daily stipend plus mileage.

Article 2545 of the Louisiana Code, upon which the granting of attorney's fees is premised, is not explicit on the matter,[13] but Louisiana courts routinely allow additional compensation for expert witnesses pursuant to La.R.S. 13:3666.[14]

Whether the granting of such fees should be decided by resort to state or federal law is not so readily answered. Professors Wright, Miller, and Kane treat the question as one barely worthy of mention:

The award of costs is governed by federal law. There has been some suggestion that in diversity cases federal courts should look to state law as to costs, in deference to the doctrine of Erie Railroad Company v. Tompkins. With regard to ordinary items of costs, particularly those mentioned in Section 1920 of Title 28, the suggestion clearly is unsound. Variations between state and federal practice in the assessment of costs after the case has been disposed of do not appear likely to promote forum shopping or to affect "the outcome of the litigation" in any significant way and

therefore employing federal law does not violate the underlying policies of the Erie principle. Furthermore, to require federal courts to look to state law in diversity cases would amount to treating the sections of the Judicial Code regulating costs and Rule 54(d) as invalid in those actions, a possibility that conceivably might have been justified under the Erie opinion itself but one that has been uniformly rejected by scholars and is not supported by the case law since the Erie decision.

10 C. Wright, A. Miller, & M. Kane, *Federal Practice & Procedure* § 2669 (1983) (footnotes omitted). We, however, held almost squarely to the contrary in a 1968 decision, reaffirmed on a subsequent appeal. *Henning v. Lake Charles Harbor & Terminal Dist.*, 387 F.2d 264 (1968) (*Henning I*), *appeal after remand*, 409 F.2d 932 (5th Cir.1969) (*Henning II*). In *Henning I* a nonresident owner of Louisiana land removed an expropriation (condemnation) proceeding to federal court. The trial court's judgment was vacated and remanded for specific findings of fact and conclusions of law, but we reached the expert witness fee question. We noted that Louisiana treats expert witness compensation as costs, rather than damages and, further, that federal district courts have no authority to tax witness compensation beyond the statutory minimum.

Nevertheless, Louisiana law, R.S. 13:3666 proves [sic] that "the fees and expenses of experts summoned and used by the successful litigant may be taxed as costs." This, it has been held by the Supreme Court of Louisiana, is necessary in order that the property owner may

with federal question cases in which the issue was whether federal law permitted granting of excess expert witness fees.

**13.** Civil Code article 2545 provides:

The seller, who knows the vice of the thing he sells and omits to declare it, besides the restitution of price and repayment of the expenses, including reasonable attorneys' fees, is answerable to the buyer in damages.

**14.** La.R.S. 13:3666, entitled "Compensation of expert witnesses," establishes in pertinent part:

A. Witnesses called to testify in court only to an opinion founded on special study or experience in any branch of science, or to make scientific or professional examinations, and to state the results thereof, shall receive additional compensation, to be fixed by the court, with references to the value of time employed and the degree of learning or skill required.
B. The court shall determine the amount of the fees of said expert witnesses which are to be taxed as costs to be paid by the party cast in judgment....

receive that just compensation required by the Constitution of Louisiana, *State, Through Dept. of Highways v. Barineau*, 225 La. 341, 72 So.2d 869 (1954). We accordingly hold that this reimbursement, by whatever name called or by whatever procedure handled in the state court system, is a substantive requirement of Louisiana law, a substantive right of the landowners, and binding upon this Court, *Erie Railroad Company v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). We do not reach nor intimate any opinion as to what the rights of these property owners might be in this regard under the Fourteenth Amendment.

387 F.2d at 267. Citing similar Louisiana jurisprudence, we affirmed this holding in *Henning II.* 409 F.2d at 937 (citations omitted). Almost contemporaneously we noted in an opinion rendered from the bench that there was no validity to a claim in a diversity suit for expert witness fees in excess of statutory amounts. *Gerber v. Stoltenberg*, 394 F.2d 179 (5th Cir.1968). That holding, which this panel must accept as binding, was not without substantial precedent. *E.g., Henkel v. Chicago, St. Paul, Minneapolis & Omaha Ry.*, 284 U.S. 444, 52 S.Ct. 223, 76 L.Ed. 386 (1932); *United States v. Kolesar*, 313 F.2d 835, 837 (5th Cir.1963) ("categorically determined that expert witness fees are not taxable under 28 U.S.C. § 1821"); *Green v. American Tobacco Co.*, 304 F.2d 70 (5th Cir. 1962), *cert. denied*, 377 U.S. 943, 84 S.Ct. 1349, 12 L.Ed.2d 306 (1964).

The *Henning* line of cases has been confined to the specific facts then at bar—Louisiana eminent domain proceedings. *United States v. 1,380.09 Acres of Land*, 574 F.2d 238 (5th Cir.1978), *rev'd on other grounds sub. nom., United States v. Bodcaw*, 440 U.S. 202, 99 S.Ct. 1066, 59 L.Ed.2d 257 (1979); *Burgess v. Williamson*, 506 F.2d 870 (5th Cir.1975); *accord, Kivi v.*

*Nationwide Mut. Ins. Co.*, 695 F.2d 1285 (11th Cir.1983); *Bosse v. Litton Unit Handling Sys.*, 646 F.2d 689 (1st Cir.1981). While special state constitutional interests operate in the realm of state condemnation proceedings, such considerations do not arise in the typical diversity action. There is merit to the argument that no violence is done to the twin aims of the *Erie* doctrine by the application of federal procedural provisions to the taxing of costs, including expert witness fees. Several circuits have so held. *E.g., Bosse; Kivi; Dominic v. Hess Oil V.I. Corp.*, 841 F.2d 513 (3d Cir. 1988); *Chaparral Resources, Inc. v. Monsanto Co.*, 849 F.2d 1286 (10th Cir.1988). Absent an express indication from the Louisiana legislature, or its courts, of Louisiana's special interest in providing litigants with recovery of expert witness fees in redhibition cases, the trial court did not err in declining to exceed the statutory witness compensation provisions of section 1821.

### 6. *Attorney's fees*

■■■■ Sears' contention that the trial court erred in awarding attorney's fees is principally intertwined with its unavailing arguments that the jury erred in not finding in its favor. Failing to persuade us there, Sears further maintains that the fees awarded were far in excess of Cates' redhibitory recovery, and thus should be reduced. The standard for reviewing an attorney's fees award is abuse of discretion. *Gulf Union Indus. v. Formation Sec., Inc.*, 842 F.2d 762 (5th Cir.1988). The trial court applied Louisiana attorney's fees guidelines similar to those announced in *Johnson v. Georgia Highway Express*, 488 F.2d 714 (5th Cir.1974).

■■■■ In *Phillippe v. Browning Arms Co.*, the Louisiana Supreme Court blurred the distinction between products liability and redhibitory claims. 395 So.2d 310, 318–19 (La.1980) (on rehearing).[15] The at-

---

**15.** The court wrote:
> We conclude that the right and the extent of recovery by the purchaser of a thing against the seller or manufacturer is governed by the codal [sic] articles providing for responsibility in the seller-purchaser relationship, as applied

through C.C. art. 2315. Since C.C. art. 2545 clearly provides for recovery of damages caused by a defective product and for reasonable attorney's fees, we conclude the court of appeal correctly made such award.

torney's fees need not be awarded only for the work performed on the redhibition claim, given that the facts introduced in proof of the redhibitory defect necessarily overlapped and were intertwined with the products liability evidence. *Jordan v. General Motors Corp.*, 624 F.Supp. 72 (E.D.La. 1985). There is no firm limitation on the amount of fees in a products liability/redhibition case, nor is the amount inexorably linked to the cost of the product, as Sears suggests. Rather, under Louisiana law, the trial court must award a reasonable fee commensurate with the required level of legal services performed. *Moody v. Arabie*, 498 So.2d 1081 (La.1986). The court's delineation of the reasons underlying its calculation need not be restated on appeal, except for its final findings that

> this amount adequately compensates plaintiffs for the amount of time and labor that reasonably should have been expended in preparing and presenting this case to a jury over a six-day period. Such an amount will promote the legislative policy of encouraging litigants to exercise their substantive rights in such cases. This amount also provides an incentive to counsel to delegate non-legal work to administrative personnel, to avoid duplication of effort by multiple lawyers and to otherwise control the rising cost of litigation.

We find neither error nor abuse of discretion in the trial court's award of $29,000 to Cates as attorney's fees.

The judgment-on-verdict and judgment of the district court are, in all respects, AFFIRMED.

395 So.2d at 319. *See also Storey v. Lambert's Limbs & Braces, Inc.*, 426 So.2d 676 (La.App. 1982).